# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**JOHN ANDREW GOODRIDGE, ESQ.**
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana



FILED
Jul 20 2012, 9:04 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JAMES LEE PAUL, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No.  82A05-1111-CR-634 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable J. Douglas Knight, Special Judge
Cause No.  82D02-0905-MR-479

**July 20, 2012**

**OPINION – FOR PUBLICATION**

**DARDEN, Judge**

James Lee Paul appeals his conviction of and sentence for murder, a felony.[1]

We affirm.

ISSUES

1.      Whether the trial court abused its discretion in denying Paul's objection to the admission of evidence obtained pursuant to a search warrant after his warrantless arrest inside his apartment.

2.      Whether the imposed sentence is inappropriate.

FACTS

Shortly after midnight on May 27, 2009, Paul and Richard Wroten entered 36 West Iowa Street in Evansville, a residence owned by Charles Burns, Sr., and killed Charles Burns, Jr. as he lay sleeping. Paul struck Burns on the head with a crow bar between thirty and sixty times as if he was "chopping wood." (Tr. 402). Burns suffered massive head injuries, and he died during Paul's attack. Paul killed Burns because he had a previous feud with Burns, Sr. over possession of some of Paul's personal property and because Paul had recently seen Burns riding what Paul believed to be Paul's bicycle.

At Paul's insistence, Wroten also struck Burns' body at least one time with a flat pry bar. Paul threatened to kill Wroten if he told anyone about the murder.

Paul and Wroten briefly parted ways, and Wroten returned to a residence where he lived with his girlfriend. His clothes and body were covered in blood, so he washed

---

[1] Ind. Code § 35-42-1-1.

himself and then tried to burn his clothing. About ten minutes later, Paul appeared and extinguished the flaming clothes. Paul told Wroten that he would kill both Wroten and his girlfriend if they told anyone about the murder.

Paul took Wroten to a water hose behind an abandoned building, where the two washed themselves and changed clothes, an action that took about ten to fifteen minutes. Paul put his and Wroten's soiled clothing into a backpack, but accidently left a red shirt on a metal rack located behind the abandoned building. The two then went to Paul's apartment in an old house located at 30 East Virginia, which was about two blocks from the murder scene. Again, Paul told Wroten that he would kill him if he told anyone about the murder. Wroten left about five minutes later and returned home. At 1:18 a.m., Wroten called 911 and reported the murder.

At 1:22 a.m., Evansville Police Officers Jeff Kingery and Keith Smith met Wroten near the murder scene. Officer Smith knew Wroten from three or four previous runs. Wroten explained that he had witnessed the murder, and he both pointed out the 36 West Iowa Street murder scene and stated that Burns' body could be found in the middle room. At 1:29 a.m., Officer Smith briefly entered the residence and found Burns' body, which had been beaten so badly that his face was unrecognizable. Detective Michael Jolly was immediately notified.

Wroten told the officers that Paul had committed the murder and that Paul lived at 30 East Virginia. Officer Kingery placed Wroten in his police vehicle and asked Wroten

3

to show him where Paul lived. Officer Jonathan Oakley followed. Wroten took them to Paul's residence at 30 East Virginia and pointed out the building. Officer Kingery then returned Wroten to Detective Jolly at the murder scene for a statement, while Officer Oakley remained at 30 East Virginia.

Within minutes thereafter, Officer Dan Deeg and Sergeant David Barron arrived at the 30 East Virginia address to attempt to secure the building and to locate Paul, whose appearance was established by a computer search prior to entry into the building. Officers Deeg and Oakley, with Seargent Barron following, entered the multiple-apartment building through an unlocked common door and proceeded up what appeared to be common-area stairs. Their goal was to determine in which apartment unit Paul lived. At the top of the stairs, the officers saw an open door, and they observed Paul inside using a wrench on Burns' bicycle. Because of loud music emanating from the apartment, Paul did not hear the officers approaching. However, because Paul's door was opened wide directly above the common stairs, the officers were concerned that Paul would turn and see them.

Not knowing what Paul might do, the officers announced themselves, entered the apartment unit with weapons drawn, and arrested Paul. At the time, no arrest warrant had been issued. The officers escorted Paul out of the building, and then secured his apartment unit to obtain a search warrant. A subsequent search pursuant to the warrant produced Burns' bicycle and the backpack containing the bloody clothes and the murder

4

weapon. The charred clothing still smelled of an accelerant, and a plaid shirt worn by Paul at the time of the murder contained Burns' blood. The murder weapon also contained Burns' blood.

A search of the area behind the abandoned building where Paul and Wroten used the hose revealed the red shirt that contained both Paul's DNA and Burns' blood. A window pane from the door of 36 West Iowa, which had been removed by Paul to allow entrance into the building where Burns was staying and then handed to Wroten for disposal, was discovered, and it contained Wroten's partial latent print. The flat pry bar that Wroten had possessed during the murder also contained Burns' blood and skin cells.

The State charged Paul with murder, and he responded by filing a motion to suppress all evidence seized from his apartment on the basis that "entry into the residence was without a warrant for arrest or search and without exigent circumstances." (App. 66). The trial court denied the motion to suppress, and Paul raised a continuing objection at trial based upon the motion.

The jury found Paul guilty of murder. After a sentencing hearing, the trial court imposed a sixty-five year sentence.

DECISION

1. Admissibility of Evidence

Paul contends that the trial court erred in denying his objection to the admission of the bicycle, backpack, bloody clothes, and murder weapon found inside his apartment.

5

Paul cites *Payton v. New York*, 445 U.S. 573 (1980) in support of his contention, noting that the case holds that the Fourth Amendment to the United States Constitution prohibits police officers, absent exigent circumstances, from making a warrantless entry into a private residence in order to make a felony arrest.[2]

A trial court is afforded broad discretion in ruling on the admissibility of evidence, and we will reverse such a ruling only upon a showing of an abuse of discretion. *Gibson v. State*, 733 N.E.2d 945, 951 (Ind. Ct. App. 2000). An abuse of discretion occurs when a decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Redding v. State*, 844 N.E.2d 1067, 1069 (Ind. Ct. App. 2006). In reviewing the admissibility of evidence, we consider only the evidence in favor of the trial court's ruling and any unrefuted evidence in the appellant's favor. *Id.*

The Fourth Amendment reads:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

A principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter a residence for purposes of search or arrest. *State v. Straub*, 749 N.E.2d 593, 597 (Ind. Ct. App. 2001) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984)). Thus,

---

[2] Paul does not separately address the propriety of the officers' conduct under Article I, section 11 of the Indiana Constitution.

"[w]arrantless searches and seizures inside the home are presumptively unreasonable." *Woodson v. State*, 966 N.E.2d 780, 787 (Ind. Ct. App. 2012) (quoting *Krise v. State*, 746 N.E.2d 957, 961 (Ind. 2001)).

"The warrantless arrest of a person in his or her home requires both probable cause and 'exigent circumstances . . . that make it impracticable to obtain a warrant first.'" *Sapen v. State*, 869 N.E.2d 1273, 1277 (Ind. Ct. App. 2007) (quoting *Adkisson v. State*, 728 N.E.2d 175, 177 (Ind. Ct. App. 2000)), *trans. denied.* Exigent circumstances have been found where (1) a suspect is fleeing or likely to take flight in order to avoid arrest; (2) incriminating evidence is in jeopardy of being destroyed or removed unless an immediate arrest is made; (3) a violent crime has occurred and entry by police can be justified as a means to prevent further injury or to aid those who have been injured; and (4) hot pursuit or movable vehicles are involved. *Straub*, 749 N.E.2d at 597-98. The validity of a warrantless arrest is determined by the facts and circumstances of each case. *Id*. at 598. An important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made; however, no exigency is created simply because there is probable cause to believe that a serious offense has been committed. *Welsh*, 466 U.S. at 753.

Here, police officers learned from Wroten within a short time after the murder and subsequent attempted cleanup that Paul lived in the 30 East Virginia apartment building. This knowledge allowed Officers Deeg and Oakley, along with Sergeant Barron, to find

7

Paul within a short time after Wroten reported the murder but prohibited them from ascertaining specific knowledge about the location of Paul's apartment within the building or the number and specific location of other tenants in the building. Thus, the officers found themselves in a situation where they observed Paul, whom they had probable cause to believe had just committed a vicious murder and who had threatened to commit at least two more murders, while they were standing on an exposed stairway. Not knowing whether Paul had a weapon and could cause them or tenants harm if they tried to retreat down the exposed stairway, the officers made the arrest. Furthermore, at the time the officers observed Paul from the stairs, he appeared to be tampering with Burns' bicycle, which was a major piece of evidence in the case. We cannot say that the trial court abused its discretion as the danger to the officers and tenants, coupled with the tampering of evidence, was an exigent circumstance that made it impracticable for the officers to obtain an arrest warrant before making the arrest. Furthermore, we cannot say that the officers contrived the urgent situation that necessitated Paul's warrantless arrest. We affirm the trial court's denial of Paul's objection to the admission of items later found in the apartment pursuant to a search warrant.

2.    Inappropriate Sentence

Paul contends that the sixty-five year sentence imposed by the trial court is inappropriate. He argues that this maximum sentence "in essence, gives no weight to the mitigating circumstances found by the trial court and designates [Paul] as the worst of the

8

worst." Paul's Br. at 14. Paul cites the trial court's finding that Paul had little formal education and that he had a history of mental health referrals and substance abuse.

The revision of a sentence is authorized by the Indiana Constitution through Indiana Appellate Rule 7(B), which provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." In determining the appropriateness of a sentence, a court of review may consider any factors appearing in the record. *Schumann v. State*, 900 N.E.2d 495, 497 (Ind. Ct. App. 2009). The "nature of the offense" portion of the appropriateness review begins with the advisory sentence. *Anglemyer*, 868 N.E.2d at 491; *Richardson v. State*, 906 N.E.2d 241, 247 (Ind. Ct. App. 2009). The "character of the offender" portion of the sentence review refers to general sentencing considerations and the relevant aggravating and mitigating circumstances. *Major v. State*, 873 N.E.2d 1120, 1130 (Ind. Ct. App. 2007), *trans. denied*. A defendant bears the burden of persuading us that his sentence is inappropriate in light of both the nature of his offense and his character. *Williams v. State*, 891 N.E.2d 621, 633 (Ind. Ct. App. 2008).

Regarding the nature of the offense, the trial court found that Paul's act constituted "senseless violence" as at least twenty blows with a heavy crow bar caused the breaking of every bone in Burns' face, multiple injuries to the head, and skull fractures that allowed the expulsion of brain matter. (Tr. 884). Paul's gory act of repeatedly beating a

9

sleeping victim is significantly more brutal than other murderous acts contemplated by the murder statute, and we therefore conclude that the nature of the act does not provide a persuasive reason to revise Paul's sentence.

Regarding the character of the offender, the trial court noted the mitigators listed above. In addition, however, it also noted Paul's "alarming" criminal record, which includes the 1983 mutilation of a human body where Paul and his father reputedly cut up a man's body and placed it in a box. (Tr. 883). Paul's record also includes a voluntary manslaughter conviction for the killing of his own father. In addition, Paul has two misdemeanor battery convictions; a class C felony battery conviction; a battery by bodily waste conviction; a class D felony confinement conviction; and, other felony convictions for non-violent offenses. Paul has served several sentences in the Department of Correction, and he violated a community corrections program in 2007. This conviction is his eighth felony conviction, causing the trial court to find that he is likely to commit more offenses in the future. Even in light of the mitigating factors found by the trial court, we find nothing about Paul's extremely violent character which merits a downward revision of his maximum sentence.

## CONCLUSION

The trial court did not abuse its discretion in admitting evidence obtained from Paul's apartment after his warrantless arrest. In addition, in light of the nature of the

10

offense and the character of the offender, we cannot conclude that Paul's sentence is inappropriate.

Affirmed.

NAJAM, J., and RILEY, J., concur.