# FOR PUBLICATION



**FILED**
Feb 26 2014, 6:03 am
**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**SUZY ST. JOHN**
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ERIC P. BABBS**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ROBIN HARPER, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A04-1305-CR-222 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Steven Rubick, Magistrate
Cause No. 49F19-1212-CM-081628

**February 26, 2014**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

In emergencies, law enforcement officers are often called upon to make split-second judgments as they do the dangerous work of protecting us all, judgments that we in a civil society endeavor to support as much as possible. But when, without any exigent circumstances, and after being denied consensual entry, a law enforcement officer lies to gain entry into someone's home, is that officer ". . . lawfully engaged in the execution of the officer's duties . . ." so as to justify the arrest of the owner or renter of the home and to charge her with the crime of resisting law enforcement? We answer this question in the negative and reverse Robin Harper's Class A misdemeanor resisting law enforcement conviction.

**Facts and Procedural History**

On December 3, 2012, defendant Robin Harper ("Harper") called the police to report a domestic dispute with her husband, Christian ("Christian"). Indianapolis Metropolitan Police Department Officer James Gillespie ("Officer Gillespie") responded to the call. When Officer Gillespie arrived at Harper's home, Harper met him on the street in front of her house and told him that she and Christian had been arguing and the argument escalated into a shoving match. Harper informed the officer that she was not in pain and that Christian had left the home. From previous experience, Officer Gillespie was aware that this was "an on-going issue with Miss Harper and her husband." Tr. p. 8.

Officer Gillespie then began to look for Christian. At approximately the same time, Christian called 911 and gave his location, which was two blocks away from Harper's residence. Officer Scott Hartman ("Officer Hartman") separately responded to Christian's 911 call. Officers Gillespie and Hartman met Christian at his location and

2

observed that he had two small scratches on his head, a swollen left eye, and what appeared to be a small puncture wound in his abdomen. Christian told the officers that Harper had attacked him with scissors and had struck him multiple times with her fist.

The officers returned to Harper's residence intending to arrest her for domestic battery. After Officers Gillespie and Hartman returned to Harper's residence, they "attempted to make contact with Miss Harper[.]" Tr. p. 10. According to Officer Gillespie

> [s]he was reluctant to come to the door, but she did come to the door, spoke to us through the door and then opened it so that the screen door was still there and closed. We asked if she could step outside to talk to us. She said that she did not want to go outside due to the fact that it was cold. At that point in time we asked if we could step inside to speak with her and she said that we didn't need to come inside. . . . [I]n order to get a hold of Miss Harper, I then asked her if she would sign a document for a protective order, to start some kind of protective order paperwork. At which time she opened the screen door and we stepped in to affect [sic] an arrest.

Tr. pp. 10-11. So, even though Harper expressly told the officers that they could not enter her home and had no reason to be inside her house, when Harper took Officer Gillespie's clipboard, the two officers entered the home. After Harper returned the clipboard to the officers, Officer Gillespie immediately placed her in handcuffs, with her hands behind her back.

Harper was not wearing any shoes at the time of her arrest, so Officer Hartman accompanied her to her kitchen to retrieve them. While standing behind Harper and without any warning to Harper concerning what he was about to do, Officer Hartman attempted to remove Harper's wedding ring from her finger. In response, Harper immediately and "violently thrusted her shoulders forward . . . [p]ulling away from

3

[Officer Hartman] causing [him] to lose the grip [he] had on her." Tr. p. 46; see also Tr. p. 49 (stating "she kind of took a half step forward, rotating her shoulders in a violently quick action movement"). She then "took a stance toward Officer Hartman." Tr. p. 29. Officer Gillespie saw Harper pull away from Officer Hartman, and went into the kitchen to assist him.[1] The officers placed their hands on Harper's shoulders, forcibly sat her down in a kitchen chair and proceeded to remove Harper's ring. Officer Hartman did so because "anything that could be taken off the body has to be taken off" before transporting the individual to the Adult Processing Center at the jail in Marion County. Tr. p. 51. Neither officer explained this policy to Harper prior to attempting to remove her wedding ring.

As a result of this series of events, Harper was subsequently charged only with Class A misdemeanor resisting law enforcement; she was not charged with domestic battery. Harper waived her right to a jury trial, and a bench trial was held on April 15, 2013. The trial court specifically found that the officers used a "ruse" to enter her home, but concluded that Harper consented to the officers' entry when she opened her door to them. Tr. p. 75. The trial court then found Harper guilty as charged and ordered her to serve 365 days. She received credit for ten days already served and the remainder of her sentence was suspended without probation. Harper now appeals.[2]

**Standard of Review**

---

[1] Officer Hartman testified that he did not know if Officer Gillespie "actually helped" him. Tr. pp. 49-50

[2] We held oral argument in this appeal on February 3, 2014, at Fishers High School in Fishers, Indiana. We extend our gratitude to the faculty, staff, and students for their hospitality. We also commend the Fishers High School State Championship We the People Team and wish them well at the National Competition.

4

When we review a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of witnesses. Chappell v. State, 966 N.E.2d 124, 129 (Ind. Ct. App. 2012) (citing McHenry v. State, 820 N.E.2d 124, 126 (Ind. 2005)), trans. denied. Rather, we consider only the probative evidence supporting the conviction and the reasonable inferences to be drawn therefrom. Id. If there is substantial evidence of probative value from which a reasonable trier of fact could have drawn the conclusion that the defendant was guilty of the crime charged beyond a reasonable doubt, then the judgment will not be disturbed. Baumgartner v. State, 891 N.E.2d 1131, 1137 (Ind. Ct. App. 2008).

**The Resisting Law Enforcement Statute**

Indiana Code section 35-44.1-3-1 provides in pertinent part: "A person who knowingly or intentionally . . . forcibly resists, obstructs, or interferes with a law enforcement officer . . . *while the officer is lawfully engaged in the execution of the officer's duties*" commits Class A misdemeanor resisting law enforcement. (Emphasis added). As shown by the facts before us, and as our supreme court recently observed, this "seemingly simple statute . . . has proven to be complex and nuanced in its application." Walker v. State, 998 N.E.2d 724, 726 (Ind. 2013).

**Discussion and Decision**

At the outset of its argument that our court should affirm Harper's conviction, the State urges us to conclude that the "ruse" perpetrated by Officer Gillespie to gain entry to Harper's home is not significant to the outcome of this appeal. We do not agree. Indeed, the manner in which the officers gained entry to Harper's home is at the core of our

concern and holding. Public trust and confidence in law enforcement officers would surely be eroded if we were to sanction an officer's fraudulent statements or activity in order to enter a residence when there were no exigent circumstances to justify such conduct. Implicitly acknowledging this public policy concern, our courts have held that "[c]onsent to entry is generally valid except when it is procured by fraud, duress, fear, intimidation, or when it is merely a submission to the supremacy of the law." Phillips v. State, 492 N.E.2d 10, 18 (Ind. 1986) rev'd on other grounds by Moore v. State, 498 N.E.2d 1 (Ind. 1986); Smith v. State, 505 N.E.2d 81, 84 (Ind. Ct. App. 1987); see also Croker v. State, 989 N.E.2d 812, 820 (Ind. Ct. App. 2013) (stating "[a] consent to search is valid except where it is procured by fraud, duress, fear, intimidation, or where it is merely a submission to the supremacy of the law"), trans. denied.

In this case, Harper came to the door of her residence in response to the officer's knock. After Officer Gillespie asked to come inside, Harper expressly denied the officers entry to her residence and told them they had no reason to be inside her home. Therefore, to induce Harper to open her screen door to the officers, Officer Gillespie lied to Harper and told her that he needed her to sign protective order documents against her husband. Harper opened her screen door to take the documents from Officer Gillespie, and the officers entered her residence.

Under the Fourth Amendment,[3] "searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980). "[T]he physical entry of the home is the chief evil against which the wording of

---

[3] Harper does not raise any argument under the Indiana Constitution.

6

the Fourth Amendment is directed." Id. at 585; see also Ind. Code § 35-41-3-2 (stating "it is the policy of this state to recognize the unique character of a citizen's home and to ensure that a citizen feels secure in his or her own home against unlawful intrusion by another individual or a public servant"). "'The warrantless arrest of a person in his or her home requires both probable cause and 'exigent circumstances . . . that make it impracticable to obtain a warrant first.'"[4] Paul v. State, 971 N.E.2d 172, 176 (Ind. Ct. App. 2012) (quoting Sapen v. State, 869 N.E.2d 1273, 1277 (Ind. Ct. App. 2007), trans. denied (quoting Adkisson v. State, 728 N.E.2d 175, 177 (Ind. Ct. App. 2000))).

Although Officer Gillespie's purpose for entering Harper's home was to arrest her, he was still required to obtain an arrest warrant before entering her private residence. This was not a situation of hot pursuit or a crime committed in the presence of the officer. The State does not argue any other exigent circumstances, or any reason at all, that would have made it impracticable for Officer Gillespie to obtain an arrest warrant.[5]

Despite these facts and circumstances, the State posits that Officers Gillespie and Hartman lawfully entered Harper's residence because they "arrested [her] at the threshold of her residence after Harper had voluntarily opened the door[.]" Appellee's Br. at 7. In support of that argument, the State relies on United States v. Santana, 427 U.S. 38 (1976). In that case, officers investigating illegal drug buys observed Santana standing in the doorway of her house with a brown paper bag in her hand. When the officers were within fifteen feet of Santana, they got out of their van, shouted "police," and displayed

---

[4] Harper concedes that the officers had probable cause to arrest her for domestic battery.

[5] Officer Gillespie or Officer Hartman could have, at a minimum, requested an arrest warrant either by telephone or radio pursuant to Indiana Code section 35-33-5-8 and waited at the scene for it.

7

their identification. As the officers approached, Santana retreated into the vestibule of her house. The Supreme Court observed that because Santana was at the threshold of her dwelling, she was in a public place and did not have an expectation of privacy. "She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." 427 U.S. at 42.

The State's "threshold" argument and citation to Santana are unavailing because the facts and circumstances before us are markedly different. Harper's citation to Adkisson v. State, 728 N.E.2d 175 (Ind. Ct. App. 2000) is more persuasive. In Adkisson, police officers were dispatched to an apartment complex to investigate a domestic disturbance between neighbors. The officers were told that Adkisson struck her neighbors and injured them. When the officers proceeded to Adkisson's apartment to discuss the incident, Adkisson refused them entry, and therefore, they proceeded to question her from outside her door. Eventually, Adkisson attempted to shut her door, but an officer placed his foot in her doorway to prevent her from doing so. The officer then informed her that she was being arrested for battery and followed her into the residence. As the officer entered Adkisson's apartment, she pushed him and ran down the hallway. Adkisson struggled with the officers until she was sprayed with Mace three times, and was thereby subdued and then handcuffed.

Adkisson was convicted of Class A misdemeanor resisting law enforcement, and she appealed her conviction arguing insufficient evidence. Adkisson asserted that the arresting officer was not lawfully engaged in the execution of his duties because his forcible entry into her home to arrest her was not lawful.

8

Our court observed that although the arresting officer had probable cause to arrest Adkission for battery, the record did not reveal, and the State did not argue, any exigent circumstances justifying the deputy's warrantless entry into Adkisson's apartment. Id. at 177. Our court also rejected the State's citation to Santana in support of its argument that exigent circumstances were not required because Adkisson was in the threshold of her home when the officer initiated the arrest. Adkisson was not in a public place when the police officer initiated the arrest, but came to the threshold of her apartment in response to the officer's knock on her door. Also, the arresting officer did not inform Adkisson that she was under arrest until after he crossed the threshold of her apartment. Id. at 178. We therefore held that the arresting officer was not lawfully engaged in the execution of his duties as a law enforcement officer and concluded that the evidence was insufficient to support Adkisson's conviction for resisting law enforcement. Id.

Here, Officer's Gillespie's use of a "ruse" to enter Harper's home is the equivalent of the Adkisson's deputy's decision to place his foot in Adkisson's doorway to prevent her from closing her door. Harper came to the front door of her residence in response to Officer Gillespie's knock on her door and opened the prime, front door, leaving a screen door between her and the officers. This is a common courtesy in our civil society and does not indicate to someone on the outside of the screen door the owner's consent to enter into the home. Our supreme court acknowledged this principle in Cox v. State, 696 N.E.2d 853, 858 (Ind. 1998):

> Opening the door to ascertain the purpose of an interruption to the private enjoyment of the home is not an invitation to enter, but rather is a common courtesy of civilized society. Attendant to this courtesy is the ability to

9

exclude those who are knocking and preserve the integrity of the physical boundaries of the home. See, e.g., United States v. Berkowitz, 927 F.2d 1376, 1387 (7th Cir. 1991) ("A person does not abandon [the] privacy interest in his home by opening his door ... to answer a knock.... [This] is not an invitation to [enter]."). This is particularly true where an intervening screen or storm door remains closed.

In the case before us, Harper never abandoned the privacy interest in her home. She simply opened her front, prime door to answer Officer Gillespie's knock, and after she did so, she stood behind the closed screen door to speak with him. Harper never crossed the threshold of her residence onto her stoop or porch. In addition, Harper expressly denied the officers entry to her home, and rather than obtain a standard warrant for her arrest, Officer Gillespie chose to use fraud to enter the residence to arrest her.

For all of these reasons, we conclude that Officers Gillespie and Hartman unlawfully entered Harper's residence, and therefore, the officers were not engaged in the lawful execution of their duties at the time they arrested Harper and then attempted to remove her wedding ring in preparation for booking. Accordingly, the evidence is insufficient to support Harper's conviction for Class A misdemeanor resisting law enforcement, and we reverse that conviction.[6]

Reversed.

BRADFORD, J., and PYLE, J., concur.

---

[6] We need not reach Harper's second argument that the State failed to prove that she forcibly resisted.