## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 11 2020, 8:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jonathan D. Harwell
Harwell Legal Counsel LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Tywan A. James,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

February 11, 2020

Court of Appeals Case No.
18A-CR-2703

Appeal from the Marion Superior Court

The Honorable Mark D. Stoner, Judge

Trial Court Cause No.
49G06-1710-MR-39787

**Shepard, Senior Judge.**

[1] Tywan James appeals his convictions of two counts of murder by claiming error in the admission of certain evidence and insufficiency. He also asserts that his sentence is inappropriate. We affirm.

## Facts and Procedural History

[2] On September 29, 2017, twenty-three-year-old Martina Webb and twenty-one-year-old Aliyah Igartua drove from Gary to Indianapolis to pick up Jason Ballard. Ballard lived in Gary but was in Indianapolis for a family gathering at his aunt's house. Webb and Ballard had known each other since middle school and were seeing one another at the time of this incident. At some point that evening, Webb and Igartua were present with Ballard at Ballard's aunt's home on Winfield Avenue in Indianapolis.

[3] At 9:03 p.m., officers responded to a dispatch of shots fired on Winfield Avenue, but they were unable to locate a suspect. Around midnight, officers were dispatched to a vehicle fire at an address about four blocks from the Winfield Avenue location to which they had been dispatched earlier. Inside the vehicle, police found the bodies of two women who were later identified as Webb and Igartua. Webb had suffered a gunshot wound to her head, and Igartua had suffered a wound to her hand as well as her head. It was later determined that both women had died before the fire because neither of them had soot in their airways. The fire investigator determined that gasoline had been applied to the passenger compartment and portions of the car's exterior.

[4] Detective Jones, a homicide detective with the Indianapolis Metropolitan Police Department (IMPD), contacted Webb's mother and learned that Webb had come to Indianapolis to pick up Ballard. The detective then spoke to Ballard on September 30 and took a recorded statement from him.

[5] That same day, police found a pool of dried blood on the sidewalk and two .40 caliber shell casings in the same area of Winfield Avenue where shots had been fired the previous night. Testing revealed that the blood was Igartua's, and the bullet recovered from her head during her autopsy was a .40 caliber.

[6] The following day, October 1, Michael Smith, appellant's cousin, appeared at a police roll call location and spoke with Detective Jones. As he spoke, Smith was shaking, crying, and pacing, and he identified "Tywan" as the person who shot Webb. Tr. Vol. III, p. 56. Based on this information and further investigation by Detective Jones, officers prepared a photo array and showed it to Smith. Smith identified James in the array and signed his name indicating so. The State charged James with two counts of murder.[1]

[7] During her investigation, Detective Jones had obtained the name of Martell Marshall from Smith and Ballard. In March 2018, she visited Marshall and obtained a statement in which he identified "Tywan" as the shooter. *Id.* at 65.

---

[1] Ind. Code § 35-42-1-1 (2017).

[8] The case went to trial in September 2018, and Ballard, Smith, and Marshall all testified. Ballard testified he was at his aunt's house on Winfield Avenue with Smith and Marshall on September 29, 2017. He denied James' presence at his aunt's house that night, and he denied being present when the shots were fired; he testified that he had gone out in Broad Ripple that evening.

[9] Smith testified that he is a childhood friend of Webb's, that he has known Ballard his whole life, and that he has known Marshall for several years. He denied being in Indianapolis on September 29, 2017, and stated that he did not recall giving a statement to Detective Jones on October 1, that he did not recognize the photo array, and that the signature on the array was not his. The State then used Smith's statement to impeach him, and the trial court gave a limiting instruction advising the jury of such. In his statement, Smith had told Detective Jones that he had been with Ballard and Marshall on September 29, that he saw Webb get shot once in the head as she sat in the front passenger seat of her vehicle, and that James pulled the trigger. He also said that after James shot Webb, Igartua exited the vehicle and tried to run. The lone portion of Smith's statement the trial court allowed the jury to consider as substantive evidence against James was Smith's identification of "Tywan" as the shooter. *Id.* at 56.

[10] The State also called Marshall, who testified that he is from Gary and that he knew Webb and knows Ballard and Smith. He acknowledged that he was in Indianapolis on September 29 with Ballard and Smith at Ballard's aunt's house. He confirmed that he heard gun shots but said he did not see the person who

fired the gun. For impeachment purposes only, the State was allowed to question him about his statement to Detective Jones. He testified that he remembered talking to the detective but did not recall telling her he saw the perpetrator shoot Webb in the head or naming James as the shooter. As it had done previously with Smith, the trial court admitted as substantive evidence Marshall's identification of the shooter as "Tywan." *Id.* at 65.

[11] A jury convicted James as charged. He was subsequently sentenced to sixty years on each count of murder, to be served consecutively.

# Issues

[12] James presents five issues, which we consolidate and restate as:

> I.  Whether the court erred by admitting certain evidence;
>
> II.  Whether there was sufficient evidence to support James' convictions; and
>
> III.  Whether James' sentence is inappropriate.

# Discussion and Decision

## I. Admission of Evidence

[13] The trial court's ruling on the admission or exclusion of evidence is reviewed for abuse of discretion. *Cherry v. State*, 57 N.E.3d 867 (Ind. Ct. App. 2016), *trans. denied*. An abuse of discretion occurs when a decision is clearly against the logic and effect of the facts and circumstances before the court. *Paul v. State*,

971 N.E.2d 172 (Ind. Ct. App. 2012). Error in the admission of evidence will prevail on appeal only if it affects the substantial rights of a party. *Carter v. State*, 31 N.E.3d 17 (Ind. Ct. App. 2015), *trans. denied*.

### *A. Cell Phone Contents*

James first challenges the admission of evidence collected from his cell phone pursuant to a search warrant. That evidence consisted of a Facebook Messenger message and internet browser history that tended to prove that James was the shooter.

The gist of James' argument is that the warrant issued for the contents of his phone was invalid because the State omitted material facts in the supporting probable cause affidavit. Specifically, James claims error with the fact that the affidavit contains information provided by Smith in his statement to Detective Jones on October 1, 2017, but it omits the fact that some of those statements were contradicted by Smith in his deposition in May 2018.

The task of the issuing magistrate in deciding whether to issue a warrant is to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place. *Brown v. State*, 905 N.E.2d 439 (Ind. Ct. App. 2009). A reviewing court, then, must determine whether the magistrate had a substantial basis for concluding that probable cause existed. *Id.* The reviewing court focuses on whether reasonable inferences drawn from the totality of the evidence support the determination of probable cause, and, in doing so, the

reviewing court affords significant deference to the magistrate's determination. *Houser v. State*, 678 N.E.2d 95 (Ind. 1997). Furthermore, doubtful cases are to be resolved in favor of upholding the warrant, and we will not invalidate warrants by interpreting probable cause affidavits in a hypertechnical, rather than a commonsense, manner. *Rios v. State*, 762 N.E.2d 153 (Ind. Ct. App. 2002).[2]

[17] A probable cause affidavit must include all material facts known to law enforcement, which includes those facts that cause the existence of probable cause to be questioned. *Ware v. State*, 859 N.E.2d 708 (Ind. Ct. App. 2007), *trans. denied*. When the State has failed to include a material fact, we will determine the validity of the warrant by considering collectively the omitted information and the information contained in the affidavit. *Id.*

[18] For a warrant to be invalid due to omission of information from an affidavit, the defendant must show (1) that the police omitted facts with the intent to make, or in reckless disregard of whether it made, the affidavit misleading and (2) that the affidavit, if supplemented with the omitted information, would not have been sufficient to support a finding of probable cause. *Gerth*, 51 N.E.3d 368. Omissions from an affidavit are made with reckless disregard if an officer

---

[2] When ruling on the admission of evidence at trial following the denial of a motion to suppress, a trial court must consider the foundational evidence presented at trial as well as the evidence from the suppression hearing that is favorable to the defendant, only to the extent it is uncontradicted at trial. *Gerth v. State*, 51 N.E.3d 368 (Ind. Ct. App. 2016).

withholds a fact within her knowledge that any reasonable person would have understood to be a fact the judge would wish to know. *Id.*

[19] Applied here, James must show (1) Detective Jones omitted Smith's contradictory deposition statements with the intent to make, or in reckless disregard of whether it made, her affidavit misleading and (2) if the affidavit had disclosed Smith's deposition statements, the affidavit would not have been sufficient to find probable cause.

[20] At the suppression hearing, Detective Jones indicated that, although she was aware that there were some differences between Smith's deposition testimony and his October 1 statement, she had not read the transcript of his deposition testimony before submitting her affidavit. She testified that she used the affidavit she had previously submitted for the warrant for James' arrest and just added the cell phone information. Detective Jones further stated that her first affidavit was based on Smith coming to roll call of his own accord and asking to speak to a detective who was investigating a double homicide in which the bodies of two women were burned. In addition, Smith had identified James in the photo array, and some of the information Smith provided had been confirmed by physical evidence and corroborated by Ballard's statement.

[21] The trial court determined that the detective's omission, though negligent, does not reflect reckless disregard because the detective had serious doubts that the information supplied by Smith during his original statement was false. The court also concluded that even if it found the detective's omission to be reckless

under the first factor, it would still find probable cause to issue the warrant, even considering Smith's deposition, under the second factor. The court explained: "With the 30 claims of memory loss in the deposition, combined with the 5th Amendment assertions to non-incriminating questions, it would not be unreasonable for the reviewing judge to determine Smith had simply become scared or non-cooperative and to not discount Smith's original statement to the detective, even if it were not under oath." Appellant's App. Vol. 2, p. 186.

[22] We think the detective's omissions were more than simply negligent. In setting forth the information Smith provided to law enforcement in October 2017, the affidavit states that Smith "has no reason to be untruthful or provide false information." *Id.* at 169. The detective used her original affidavit containing this language despite knowing that Smith's May 2018 deposition testimony contradicted his earlier statement. We believe the omitted information concerning Smith's deposition testimony is the kind of thing that any reasonable person would have known the judge would want to know and that the information was omitted with reckless disregard of whether the affidavit would be misleading.

[23] Still, an affidavit containing the omitted information would have been sufficient to support a finding of probable cause. The affidavit would still contain information from Smith's October 2017 statement, which the issuing magistrate could have reasonably considered. Indeed, as the trial court stated, in light of Smith's numerous claims of memory loss and assertions of Fifth Amendment protection during his deposition, the issuing magistrate could have determined

that Smith had changed his statement due to fear. Moreover, the affidavit indicated that the records of an initial cell phone number provided to the police by James confirm he was at the scene of the shooting. The affidavit further provides that, at the time of his arrest, James was in possession of a cell phone with a different number and that he had previously called his parole officer from that number. It is the contents of this phone that the State sought to inspect. Consequently, the affidavit still provided the issuing magistrate with a substantial basis for concluding that probable cause existed. Therefore, we conclude the omission at issue here was not fatal.

### B. Smith's Testimony

[24] James also asserts the trial court erred by admitting Smith's testimony at trial. He says the State called Smith as a witness for the sole and impermissible purpose of impeaching him and thus presenting to the jury the otherwise inadmissible evidence of his October 2017 statement.

[25] The State certainly had the right to impeach Smith, its own witness. *See* Ind. Evidence Rule 607. But, "a party is forbidden from placing a witness on the stand when the party's sole purpose in doing so is to present otherwise inadmissible evidence cloaked as impeachment." *Appleton v. State*, 740 N.E.2d 122, 125 (Ind. 2001). The question is thus whether calling Smith as a witness served any legitimate non-impeachment purpose.

[26] Prior to trial, Smith had provided an unsworn statement to Detective Jones during which he identified James as the shooter. At trial, the State called Smith

as a witness. Smith testified that he is from Gary, that he is a childhood/neighborhood friend of Webb and has known her for many years, that he is James' cousin and has known James his whole life, that he has known Marshall for several years and Marshall's nickname is "Tells," and that he has known Ballard his whole life. Tr. Vol. II, p. 115. He verified his cell phone number, which number the State subsequently showed had used towers in Indianapolis in the vicinity of the murders on September 29 and had cellular contact with James' phone. When asked whether he was in Indianapolis on September 29 and if he had seen Marshall or Ballard on that date, Smith responded negatively. The court gave a limiting instruction that information from Smith's prior statement was to be used only for a credibility determination and not as substantive evidence. The State then asked Smith whether he recalled meeting with Detective Jones and giving a statement on October 1 that he had witnessed Webb being shot in the head and that James was the shooter. Smith responded in the negative.

[27] Thus, in addition to his allegedly inadmissible statement of October 2017, Smith was questioned and provided substantive testimony about his relationship to James and other witnesses as well as his mobile phone number in September 2017. Smith's cell phone records and the testimony of both Ballard and Marshall establish Smith's presence in Indianapolis in the area and at the time of the murders. Consequently, we cannot definitively say the State placed Smith on the stand for the sole purpose of impeaching him and admitting otherwise inadmissible evidence. *See Kendall v. State*, 790 N.E.2d 122

(Ind. Ct. App. 2003) (witness' testimony could not be said to have been offered solely to impeach witness with prior statement where witness provided other relevant testimony regarding vehicle suspects were driving, how suspects were dressed, and suspects' actions), *trans. denied*.

### C. Marshall's Identification of James

James additionally urges that the trial court abused its discretion by admitting Marshall's prior statement to Detective Jones identifying James as the shooter. James claims the statement was inadmissible under Evidence Rule 801(d)(1)(C) because the identification was made several months after the murders occurred.

Rule 801(d)(1)(C) provides that a statement is not hearsay if the declarant testifies and is subject to cross-examination about a prior statement, and the statement is an identification of a person shortly after perceiving the person. The gist of James' claim is whether Marshall's identification some five months after the murders qualifies as an identification made "shortly after perceiving" James.

In *Robinson v. State*, 682 N.E.2d 806 (Ind. Ct. App. 1997), this Court held that an identification within two and a half months after shootings satisfied the purpose and requirements of Rule 801(d)(1)(C). In doing so, the Court looked to guidance from the history of Federal Rule of Evidence 801(d)(1)(C), which, with the exception of the term "shortly," is identical to our state version. Noting that its analysis was hampered by the absence of advisory notes to the Indiana Rules of Evidence and that the federal rule would provide no guidance

as to the term "shortly," the Court turned to the rationale for the federal rule in search of a better understanding of the purpose of our state rule. The Advisory Committee Notes to the federal rule state that identifications, such as Marshall's in the instant case, are defined as non-hearsay because "'the context of a formal proceeding, an oath, and the opportunity for cross-examination provide firm additional assurances of the *reliability* of the prior statement.'" *Robinson*, 682 N.E.2d at 811 (quoting FED. R. EVID. 801(d)(1)(C) advisory committee's note). The committee's note thus underscores the focus of the rule: reliability of the identification. *Robinson*, 682 N.E.2d at 811. Given this emphasis on reliability, the Court concluded that Indiana added the requirement that the identification be made "shortly after perceiving" to "further buttress the reliability and accuracy of the identification." *Id.* The Court further observed that, in dealing with identification questions, courts of this state have frequently recognized the additional accuracy of an identification made shortly after the event when memories are fresh. *Id.* (citing *Leslie v. State*, 558 N.E.2d 813, 815 (Ind. 1990)).

[31]   Here, on March 13, 2018, Marshall gave a statement to the detective in which he admitted being at the scene on September 29 and identified James as the shooter. Later in the interview, Detective Jones showed Marshall a photo array that included James, but Marshall was not able to make an identification. At trial, Marshall acknowledged being from Gary and knowing Webb, Ballard, and Smith. He also admitted to being in Indianapolis on September 29 at Ballard's aunt's house with Ballard and Smith. He testified that he heard gun

shots but did not see the person who was shooting. Finally, Marshall testified that he did not recall telling the detective that James was the shooter or that he saw the shooter shoot Webb in the head. Although we have acknowledged the term "shortly" is relative rather than precise, *see Robinson*, 682 N.E.2d at 811, we cannot say Marshall's identification of James five months after the shootings satisfies the requirements of Rule 801(d)(1)(C), and, consequently, it was error to admit it.

[32] Nevertheless, the error was harmless. Marshall's identification of James as the shooter was cumulative of Smith's identification. The improper admission of evidence is harmless error when the erroneously admitted evidence is merely cumulative of other evidence before the trier of fact. *Purvis v. State*, 829 N.E.2d 572 (Ind. Ct. App. 2005), *trans. denied*.

## II. Sufficiency of the Evidence

[33] James' challenge to the sufficiency of the evidence for his convictions rests upon findings of error in all, or at least some, of the three allegations we have just examined.

[34] In reviewing challenges to the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of the witnesses. *Sandleben v. State*, 29 N.E.3d 126 (Ind. Ct. App. 2015), *trans. denied*. Instead, we consider only the evidence most favorable to the verdict and any reasonable inferences drawn therefrom. *Id.* If there is substantial evidence of probative value from which a reasonable fact-finder could have found the defendant guilty beyond a

reasonable doubt, the verdict will not be disturbed. *Labarr v. State*, 36 N.E.3d 501 (Ind. Ct. App. 2015).

[35] In support of his argument, James cites *Kiefer v. State*, 761 N.E.2d 802 (Ind. 2002), noting that Kiefer's conviction of attempted murder was reversed because the evidence showed that Kiefer did not know the victim and had no motive to kill him. Unlike the present case, however, these factors had a bearing on a requisite element of Kiefer's offense—i.e., whether Kiefer acted with the specific intent to kill the victim. That element is not required for the offense of murder; thus, *Kiefer* is inapposite to this case.

[36] Here, Ballard testified that he was at his aunt's house on Winfield Avenue in Indianapolis on September 29 with Smith and Marshall. In addition, the State presented evidence of Smith's identification of his cousin James as the person who shot Webb and testimony about James' cell phone records indicating his phone used a cellular tower just over a mile away from the scene around the time of the shots being fired. The records also show outgoing calls from James' phone to the phones of Ballard and Smith.

[37] Additional, but more modest, proof of James' guilt derives from the contents of his cell phone. This evidence showed that on the Facebook Messenger application account with display name "Tywan James" and username "Tywan.James.58," an outgoing message was sent on October 8, 2017, stating, "Boy, I'm ducking homicide." Tr. Vol. III, pp. 156, 155, 157, 158. The

evidence also showed certain URLs[3] that had been visited on James' cell phone, commencing with: "Bodies found in burning car in Indianapolis" and "Update, bodies of Gary women found in burning car." *Id.* at 159, 160. Additionally, there was a search on the web page "enow.com." on October 4 for "bodies found in Indianapolis" *Id.* at 160. The State's evidence also showed that on October 6 these URLs were visited: "Relatives share message after two women's bodies found in burning car," "Bodies of two Gary women found in burning car," and "Bodies, two Gary women found inside burning car, Indianapolis." *Id.* at 160, 161. On October 7, there were searches on "NetFind" for "Bodies found in Indianapolis" and "pictures of bodies found." *Id.* We conclude there was sufficient evidence to support James' convictions for murdering Martina Webb and Aliyah Igartua.

## III. Inappropriate Sentence

[38] Finally, James claims his sentence is inappropriate given the nature of his offenses and his character.

[39] Indiana Appellate Rule 7(B) provides that we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we determine that the sentence is inappropriate in light of the nature of the offense and the character of the offender. *Thompson v. State*, 5 N.E.3d 383 (Ind. Ct. App. 2014).

---

[3] "URL" is an abbreviation for "uniform resource locator." It is the address of a resource, such as a website, on the internet. https://www.merriam-webster.com/dictionary/URL (last visited Feb. 4, 2020).

However, "we must and should exercise deference to a trial court's sentencing decision, both because Rule 7(B) requires us to give 'due consideration' to that decision and because we understand and recognize the unique perspective a trial court brings to its sentencing decisions." *Stewart v. State*, 866 N.E.2d 858, 866 (Ind. Ct. App. 2007). The principal role of appellate review under Rule 7(B) is to attempt to leaven the outliers, not to achieve a perceived "correct" result in each case. *Garner v. State*, 7 N.E.3d 1012 (Ind. Ct. App. 2014). The defendant bears the burden of persuading the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073 (Ind. 2006).

[40] To assess whether the sentence is inappropriate, we look first to the statutory range established for the offenses. The advisory sentence for murder is fifty-five years, with a minimum sentence of forty-five years and a maximum of sixty-five. Ind. Code § 35-50-2-3 (2015). James' sentence of sixty years on each conviction was thus only modestly above the advisory.

[41] Next, we look to the nature of the offenses and the character of the offender. As to the nature of the offenses, we note this case involves two horrific and grisly murders where the victims were first shot in the head and then their bodies set aflame. Both victims were in their early 20's, and Webb had a young son while Igartua had an infant daughter.

[42] As for the character of the offender, we observe that James' record begins with true findings for what would be A misdemeanor battery in 2003, followed by a C misdemeanor operating while never having received a license and D felony

receiving stolen parts in 2004. Upon becoming an adult, James was convicted of B misdemeanor disorderly conduct in 2005. He was then convicted of A misdemeanor resisting and C misdemeanor refusal to identify in 2006, and A misdemeanor carrying a handgun without a license in 2007. Also in 2007, James was charged with aggravated armed bank robbery and use of a firearm in doing so. He was convicted of these charges and sent to federal prison from about December 2008 to April 2017, when he was released to federal probation. While on probation, he was charged in June 2017 with B misdemeanor reckless driving causing property damage. This charge was pending at the time of his sentencing in the present case. Finally, James committed the current offenses in September 2017 while he was still on federal probation.

[43] To further illustrate James' character, the State introduced at sentencing an audio recording of a phone call James made from jail in October 2018 after his trial. During the call, James indicates that he has "a surprise" when he comes back on appeal, and he suggests his accusers should "go buy a whole bunch of mother-f***in' bullet-proof vests" and states that he will "f*** them [ ] up." Ex. 4.

[44] In sentencing James, the trial court stated its belief that no mitigating circumstances existed, but it took into account that James had faced challenges growing up. The court cited his criminal history and the circumstances of the murders as aggravating factors. And, it declined the defense request for concurrent sentences.

[45]   In arguing that his sentence should be reduced, James points to the fact that he had obtained his GED, had obtained employment, and had gotten married. The deference shown to a trial court's sentencing discretion should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character). *Stephenson v. State*, 29 N.E.3d 111 (Ind. 2015). James has not met this burden.

[46]   Moreover, our Supreme Court has said that "[a]s a general rule, multiple killings warrant the imposition of consecutive sentences." *Tobar v. State*, 740 N.E.2d 109, 113 (Ind. 2000). James has not made any showing that consecutive sentences were inappropriate for these two murders.

# Conclusion

[47]   We conclude the trial court did not abuse its discretion in the admission of evidence at trial, and in the instance where it erroneously admitted evidence, it was harmless error; there was sufficient evidence to support James' convictions; and his sentence is not inappropriate.

[48]   Affirmed.

Baker, J., and Crone, J., concur.