

**FILED**

Jul 27 2016, 7:27 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Small
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Brian Reitz
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

Danny Cherry,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*

July 27, 2016

Court of Appeals Case No.
49A02-1505-CR-340

Appeal from the Marion Superior Court

The Honorable Kurt M. Eisgruber, Judge

Trial Court Cause No.
49G01-1405-FA-23650

**Brown, Judge.**

[1] Danny Cherry appeals his convictions for attempted murder as a class A felony, two counts of unlawful possession of a firearm by a serious violent felon as class B felonies, criminal recklessness as a class C felony, three counts of child exploitation as class C felonies, stalking as a class C felony, three counts of intimidation as class D felonies, and eleven counts of dissemination of matter harmful to a minor as class D felonies. Cherry raises three issues which we consolidate and restate as:

> I. Whether the trial court abused its discretion by admitting Cherry's recorded interview with police as well as documents produced by various internet and cellular providers;
>
> II. Whether the evidence is sufficient to sustain Cherry's convictions.

We affirm.

## *Facts and Procedural History*

[2] Johan Lian, who was born in 1994 and was originally from Burma, lived on Buffalo Creek in Indianapolis with his mother, father, and younger sister. At some point, Johan received a friend request from a Facebook account with the name of Sui Lung, which was the same name as a person Johan knew as being from Burma. Johan accepted the friend request, the person using the account labeled Sui Lung initiated a conversation with Johan about a party, and the person said that they did not remember Johan's address so Johan provided his address.

[3]  Johan received messages to his Facebook account from the account labeled Sui Lung that became concerning including a message that stated: "I will kill you." Transcript at 367. Johan realized that the person using the account labeled Sui Lung was not the actual Sui Lung that he knew, and asked the person to stop contacting him. Johan kept receiving messages from the person and also received pictures with a person's hands tied up and pornography. Johan removed his Facebook account and talked to the real Sui Lung who confirmed that the person he was speaking with on Facebook was not him.

[4]  On December 25, 2013, someone came to Johan's house, knocked on the door, and spoke to Johan's little sister when she answered the door. This person, later determined to be Isaac Starks who lived in Indianapolis, had met a person who called himself "Danny" on a gay chat line, and had driven to the address given to him by Danny that day to meet Danny.[1] *Id.* at 448. Johan's parents were scared, and someone called the police.

[5]  On January 4, 2014, Johan, his parents, his sister, and his older brother's family were at the residence on Buffalo Creek. Four people were sitting in the living room watching television, and Johan's father and mother were in their bedroom. Shortly after 11:00 p.m., someone banged on the living room window at the front of the house. Johan ran to the front door to make sure it was locked, and his father went into the living room and was close to the

---

[1] Johan testified that the person who came to the door asked if Johan was home. Starks testified that he asked for Danny.

window when gunfire erupted. No one was injured, and Johan's father, who did not speak English, called his pastor for help to call the police. Johan told the police about his Facebook conversations. The police found a .25 caliber live round directly in front of the picture window at the scene which is consistent with a gun jamming.

[6] Within minutes of the shooting, a Facebook account associated with Chun-li Win-Chun posted a message that read: "Mad at my gun for jammin." State's Exhibit 75. Minutes later, the account posted a message that stated: "Tell johan he lucky my gun jammed." State's Exhibit 77.

[7] Meanwhile, David Len, who lived with his father James Len, his mother, and two siblings and was a part of the Chin community[2] in Indianapolis, created a Facebook account under his Burmese name of Hlu Te and observed that "there was talk about people getting shot," his picture had been stolen from his Facebook account, and an account existed with his Burmese name spelled differently and with his picture. Transcript at 102, 104, 107.

[8] On January 6, 2014, James Len, his wife, their three children, and a cousin of the children were at home on Rentham Lane in Indianapolis. Between midnight and 1:00 a.m. someone banged on a door, and James Len reported that he had been shot in the mouth by a tall young black man in dark clothing.

---

[2] David Len's sister testified that the term "Chin" refers to the language and dialects of the Burmese people and that the term is the "umbrella group . . . or the kind of shortened term for Burmese community." Transcript at 65-66.

As a result of the injury, James Len suffered a stroke, underwent surgery, was in intensive care for twenty-three days, and is currently unable to speak.

[9] The police recovered a .25 caliber casing at the scene. On January 6, 2014, at 1:02 a.m. an account under the name Chun-li Win-Chun posted messages that read "Got me one" and "hlu hte mom right in head." State's Exhibit 76.

[10] David Len talked to Indianapolis Police Detective Timothy Fogarty and brought up his interactions on Facebook. Based upon David Len's statements, Detective Fogarty contacted Detective Steven Schafer of the cyber-crimes unit, gave him the names of the accounts, and told him that some pages were hacked or taken over by an unknown person who had been making threats regarding the incident and the Chin community.

[11] On January 8, 2014, a message was posted from an account labeled Hlu Hte that stated: "I tried finish him but my gun James" followed by the message "Jammed." State's Exhibit 78. That same account also posted messages which stated: "Or i can find u like hlu," "i thought it was his mom," "But it was his dad," "If my gun didn't Jam i would have finished the job," "Went inside," and "I going to kill then hypocrites." State's Exhibit 79.

[12] Meanwhile, between December 2013 and February 2014, fourteen year old C.L., who was from Hakka Chin Burma and lived in Indianapolis, received

messages to his Facebook account from a person he did not recognize.[3]  The first message came from Na Zang and the name kept changing.  In the beginning, the person asked C.L. if he knew a girl who was one of C.L.'s Facebook friends.  C.L. told the person that he did not know her because he did not know the identity of the person who was asking him.  C.L. tried to block the person from messaging him and seeing his profile.  He changed the name on his Facebook account, deleted all his pictures, changed his school, and created a new account.  At some point, a person calling himself Chun-li Win-Chun contacted C.L. through Facebook.  C.L. knew it was the same person that contacted him earlier based upon the conversation.

[13]  On January 1, 2014, nine messages with sexually explicit photos were sent from a Facebook account with the name of Chun-li Win-Chun to C.L.'s account.  On January 5, 2014, three messages with sexually explicit photos were sent from the same Facebook account to C.L.  C.L. tried to ignore the messages, send the messages back, and then blocked the person's account.[4]  The police later determined that the Facebook ID number specific to the account with the

---

[3] C.L. testified: "My name is SL but my UN name is CL."  Transcript at 307.  He also testified that his family calls him "SL."  *Id.* at 308.  It is unclear what "UN" stands for.

[4] During the direct examination of C.L., the following exchange occurred:

Q.  You said you tried to send it back – how did – how did you do that?

A.  Just like – on the Facebook messages you can send pictures back or like part of a message back and that's –

Transcript at 325.

name Chun-li Win-Chun account had multiple names associated with it including Saigon Dior and Sui Lung.

[14] An account with the name Nomi, which was the name of one of C.L.'s friends, talked to C.L. about killing one of C.L.'s friends who was also Nomi's boyfriend at the time. The person sent C.L. a picture of the friend and his friends walking home from school.

[15] At some point, an account under the name Chun-li Win-Chun sent C.L. a picture of C.L.'s then girlfriend that she had posted publicly on her Facebook account and also told C.L. his girlfriend's correct address, which made C.L. feel insecure. At some point, the person threatened to kill C.L.'s mother because he wanted nude pictures of C.L. After C.L. became aware of the shooting of James Len, he sent pictures of himself to Chin-li Win-Chun through Facebook. The person then posted those pictures to numerous Facebook accounts.

[16] On February 18, 2014, a student at St. Mark Catholic School in Indianapolis took a phone call and then told the school secretary that the caller was threatening to kill him and he did not know the identity of the person. Rusty Albertson, the school principal, was away that morning and learned that the school was on lockdown because one of the students had received a threatening phone call. The person called back multiple times and told the secretary that he was going to come to her house or follow her home and said "kind of the same" to Principal Albertson after he arrived at the school. Transcript at 526. The person said that if Principal Albertson did not send the young man out, then he

was going to go in there and kill or shoot everybody. Principal Albertson recorded one of the calls in which the person stated that he shot the father of the young man's friend in the head.

[17] Detective Schafer obtained multiple warrants for different companies including Facebook and the service provider for the cell phone used to access Facebook. As a result of the responses to the search warrants, he determined that a Samsung Illusion model I or I110 cell phone with a specific MEID number[5] and IP address was used to access certain Facebook pages, that the phone was purchased at a Wal-Mart store in Huntsville, Alabama, that the phone number related to the phone had been changed multiple times, and that there were several phone numbers with a 317 area code that had been called repeatedly. He determined that the IP address was physically located at 5025 Blue Spring Road in Huntsville, Alabama, and was ultimately able to narrow down a specific apartment there. He passed this information to Detectives Fogarty and Edward Brickley.

[18] On April 14, 2014, Detectives Fogarty, Brickley, and Dan Asher went to Huntsville, Alabama. Detective Brickley met with Investigator Jeremy Hughes of the Madison County Sheriff's Department in Huntsville. On April 16, 2014, the detectives from Indiana went to the Huntsville Sheriff's Department offices,

---

[5] Detective Schafer testified that MEID "is a mobile equipment identifier or mobile equipment station identifier – basically it's the fingerprint or serial number – digital serial number for an individual device – in this case a cell phone. It's . . . the individual number assigned to that phone that's very specific much like a person's fingerprint." Transcript at 169.

where Cherry was jailed. Investigator Hughes told Detective Brickley that there was a toggle switch on the outside of the door of the interview room and that he could turn the recording devices on and off by flipping the switch. There was nothing in the interview room itself from which one could tell that an interview was being recorded. At some point, Cherry was placed in the interview room. When Detective Brickley walked into the interview room, he flipped the switch.

[19] Cherry was relaxed and cooperative. Detective Brickley read him his *Miranda* rights, and Cherry waived those rights and agreed to speak. After Cherry signed the waiver, the two continued casual conversation. They then took a break, and Detective Brickley flipped the switch as he left the room. Detective Brickley and Detective Fogarty entered the interview room, and Detective Brickley flipped the switch again as he entered. The detectives took breaks as needed including a restroom break, a coffee break, and a smoke break all as requested by Cherry.

[20] Cherry initially denied ever having a Facebook account. Eventually, he admitted to having a Samsung Illusion cell phone. He indicated that he did not shoot Johan's house but that he had someone shoot at it. Detective Brickley referred to the January 6th shooting, and Cherry indicated that he knew what Detective Brickley was talking about but denied shooting the father. He denied making the phone call to St. Mark's School and said that another person called the school. After Detective Brickley told Cherry that he had a recorded copy of the phone call to the school and asked Cherry why he called the school, Cherry answered and said something about "bitches," stated that the documents that

they used to "get here" are not legitimate, and that he could not obtain a decent job. State's Exhibit 66 at 15:07:00-15:08:00. He told the detectives that he would tell them everything, and mentioned the discussions he had with the Burmese children and that it "got out of control." *Id.* at 15:36:50-15:37:00. He indicated that he met some of the children in Indianapolis on a gay chat line, and said that the Burmese are given housing and so much money. When asked why he shot into the houses, he said in part that he was called "faggot." *Id.* at 15:41:40-15:41:46. He said that he met Johan through a chat line and when asked why he became so angry that he went to Johan's house, he said that Johan called him a faggot, a sissy, and a n-----.

[21] When asked how many shots he fired into Johan's house, Cherry stated that he fired maybe two or three shots into Johan's house. When asked if he remembered what kind of gun it was, he responded that it was a "deuce five," *Id.* at 15:51:45-15:51:55, which is a "[s]treet term representing . . . a .25 caliber firearm . . . ." Transcript at 143. When asked what happened to the firearm, he said that somebody else took it, that he was going to give it to someone, that he was going to put it in a stash house, that he was going to put it by a tree, and that he left it in a specific area of the Maple Grove subdivision.

[22] Cherry stated that he left a live round at Johan's house and went back to a hotel after the shooting. When asked if he had a fear of being charged with the crime, he said he felt it was his responsibility to answer for that. He admitted to shooting David Len's father, and said that he discussed the shooting of David Len's father on Facebook shortly after the shooting. Specifically, he stated that

he posted that he was the one who did it. He also stated that he rented a car from Avis and made it seem like he had a team.

[23] The next morning, the detectives from Indiana went to the Madison County Sheriff's Office to pick up a DVD of the interview, and Detective Brickley was told that there was a malfunction and the first part of the interview where Detective Brickley and Detective Asher were in the interview room with Cherry did not record.

[24] Based upon the interview, Detective Brickley obtained a hotel receipt from the Motel 6 in Beech Grove indicating that Cherry arrived there on January 4, 2014, and departed on January 6, 2014. Detective Brickley received a document from Avis Car Rental in Huntsville, Alabama, indicating that Cherry rented a car from January 2, 2014, to January 6, 2014, and that the car was driven 948 miles.

[25] On May 7, 2014, the State charged Cherry with attempted murder as a class A felony, two counts of unlawful possession of a firearm by a serious violent felon as class B felonies, criminal recklessness as a class C felony, three counts of child exploitation as class C felonies, five counts of stalking as class C felonies, six counts of intimidation as class D felonies, twenty counts of dissemination of matter harmful to minors as class D felonies, and obstruction of justice as a class D felony.

[26] On January 5, 2015, Cherry filed a *pro se* motion to suppress evidence including his statements made to the arresting officers. He alleged that Investigator

Hughes had him brought to his office against his will, that Cherry repeatedly requested to speak with his attorney, and that Investigator Hughes struck him in the face, told him to "shut up," and choked him causing him to pass out briefly and then awake on the floor soiled in his own urine and feces. Appellant's Appendix at 106. He asserted that he was induced by Investigator Hughes, who threatened more violence, to sign a waiver of rights, and then that two more investigators entered the room and told him that he could call his attorney after he initialed the waiver and answered some basic questions. On January 16, 2015, Cherry filed an amended motion to suppress which alleged that his statement was obtained as a result of physical, psychological, and mental coercion.

[27] On March 25, 2015, the court held a hearing on Cherry's motion and indicated that it looked at about the first fifteen or twenty minutes of the video and did not see duress but saw a "rapport built." Transcript at 826. The court also stated: "[B]ased on what I've reviewed from the video, I haven't seen coercion or your will being overborne, but I'll hear what you have to say during our motion – or suppression hearing here." *Id.* at 830. After some discussion, Cherry mentioned Ind. Evidence Rule 617 and asserted that a part of the tape was missing and that it was not because it did not record or that the equipment malfunctioned.

[28] Detective Brickley testified that he spoke to Investigator Hughes about interviewing Cherry and that he was sitting in Investigator Hughes's office when Cherry was brought down a hallway to the interview room. He testified

that Investigator Hughes explained to him how the recording equipment worked and that there was a switch on the outside of the room, and that "because of something to do with the amount of space that you could save on a disk – they had had issues before – so it was just an on/off switch as you entered an [sic] exited." *Id.* at 864. He indicated that he, Detective Asher, and Cherry had an initial conversation in which Detective Brickley read the custodial interrogation advice of rights form. He testified that Cherry initialed each right and did not indicate that he had any question or concerns or express any fear. He stated that he spoke with Cherry for about two minutes, then read the rights waiver, and after Cherry signed the waiver, he asked Cherry "just some preliminary questions – who he was, his family life, where he lived, things of that nature, just general information." *Id.* at 867. He stated that he flipped the switch when he left or returned to the interview room. He also testified that the recording equipment was in the same building but in a different room from the interview room.

[29] Investigator Hughes testified that the Madison County Sheriff's Department was located in Alabama and that he showed Detective Fogarty how to operate the switches. He testified that while he was waiting for Cherry to be transported, he went ahead and flipped that switch to start the recording, that he was not present when Detective Brickley went in and turned the switch on, and that it was possible that Detective Brickley actually turned it off because he had already turned it on and Detective Brickley did not know it. Investigator Hughes testified that there were instances where the system malfunctioned in

April 2014 and that the toggle switch had to be replaced in April, May, or June. He stated that he told Detective Brickley and/or Detective Fogarty to turn the switch on and off each time they went in and out because their DVDs are four hours and an interview longer than that time would comprise a file too large to burn onto a DVD. On cross-examination, Investigator Hughes testified that it was possible that they did not have the first part of the recording because of a maintenance issue. Investigator Hughes also testified that there was a maintenance report but that he did not have the report and did not pull it because that is a supervisor issue. On redirect, Investigator Hughes agreed with the prosecutor that it was fair to say that they could not prove if the equipment malfunctioned or if the switch was flipped by both him and Detective Brickley. The court denied Cherry's motion to suppress.

[30] On March 30, 2015, a four-day jury trial commenced at which Cherry represented himself. The court noted that the State was dismissing fourteen counts. David Len, David Len's sister, Detective Fogarty, Detective Schafer, C.L., Johan, Johan's father, Detective Brickley, and others testified.

[31] Without objection, the court admitted a number of exhibits related to the returns regarding the search warrants. Cherry objected to some of the State's exhibits based on multiple grounds. When the prosecutor introduced the recorded interview, Cherry objected and referred to Evidence Rule 617. The court found that the exception in Rule 617(a)(3) applied, and overruled the objection.

[32] The jury found Cherry guilty of attempted murder, criminal recklessness as a class C felony, three counts of child exploitation as class C felonies, two counts of stalking as class C felonies, three counts of intimidation as class D felonies, twelve counts of dissemination of matter harmful to a minor as class D felonies, and obstruction of justice as a class D felony. Cherry then waived his right to a jury trial with respect to the two counts of unlawful possession of a firearm by a serious violent felon and stipulated to a prior conviction for unlawful wounding in Virginia.

[33] On April 24, 2015, the court vacated the conviction for obstruction of justice and sentenced Cherry to forty years for attempted murder, ten years for each of the unlawful possession of a firearm by a serious violent felon convictions, eight years for criminal recklessness as a class C felony, five years for each of the convictions for child exploitation as class C felonies, five years for each of the convictions for stalking as class C felonies, two years for each of the convictions for intimidation as class D felonies, one year each for nine of the counts of dissemination of matter harmful to a minor as class D felonies, and two years each for three of the counts of dissemination of matter harmful to a minor as class D felonies. The court sentenced Cherry to an aggregate sentence of eighty years.

*Discussion*

I.

[34] The first issue is whether the trial court abused its discretion by admitting Cherry's recorded interview with police and documents produced by various internet and cellular providers. Generally, we review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997), *reh'g denied*. We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*. Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*.

A. *Interview with Police*

[35] Cherry points to Ind. Evidence Rule 617 and argues that the court abused its discretion in admitting the recorded portion of his interview with police because the portion of the interview lasting twenty or twenty-five minutes during which he signed the waiver of his *Miranda* rights was not recorded and there was no clear and convincing evidence as to how or if the recording equipment malfunctioned. Cherry also contends that the error was prejudicial to him because the police did not recover any of his fingerprints or DNA at the scenes, no firearm was recovered, and no witness identified him.

[36] The State contends that the exception in Rule 617(a)(3) was tailor-made for this case and points out that the detectives were in an unfamiliar interview room in Alabama, that Detective Brickley followed the instructions and flipped the

switch before commencing the interview, and that the detectives had no way of knowing if the recording device was functioning while they were inside the interview room. The State asserts that the initial portion of the interview was not recorded because of the malfunction and that the toggle switch subsequently had to be repaired and ultimately replaced. The State also notes that a significant portion of Cherry's statement was recorded and that Cherry does not contest the validity of his waiver of *Miranda* rights.

[37] Ind. Evidence Rule 617 is titled "Unrecorded Statements During Custodial Interrogation," and provides:

> (a) In a felony criminal prosecution, evidence of a statement made by a person during a Custodial Interrogation in a Place of Detention shall not be admitted against the person unless an Electronic Recording of the statement was made, preserved, and is available at trial, except upon clear and convincing proof of any one of the following:

> \* \* \* \* \*

> (3) The law enforcement officers conducting the Custodial Interrogation in good faith failed to make an Electronic Recording because the officers inadvertently failed to operate the recording equipment properly, or without the knowledge of any of said officers the recording equipment malfunctioned or stopped operating; or

> \* \* \* \* \*

> (b) For purposes of this rule, "Electronic Recording" means an audio-video recording that includes at least not only the visible

images of the person being interviewed but also the voices of said person and the interrogating officers; "Custodial Interrogation" means an interview conducted by law enforcement during which a reasonable person would consider himself or herself to be in custody; and "Place of Detention" means a jail, law enforcement agency station house, or any other stationary or mobile building owned or operated by a law enforcement agency at which persons are detained in connection with criminal investigations.

(c) The Electronic Recording must be a complete, authentic, accurate, unaltered, and continuous record of a Custodial Interrogation.

(d) This rule is in addition to, and does not diminish, any other requirement of law regarding the admissibility of a person's statements.

[38] Ind. Evidence Rule 617(a)(3) applies here. Detective Brickley testified that he followed the instructions that Investigator Hughes gave him and that there was some type of malfunction. Investigator Hughes testified that when he was waiting for Cherry to be transported, he turned the switch to start the recording, that he was not present when Detective Brickley went in and flipped the switch, and that it was possible that Detective Brickley actually turned it off because Investigator Hughes had already turned it on and Detective Brickley did not know it. Investigator Hughes also testified that there were instances where the system malfunctioned in April 2014 and that the toggle switch had to be replaced in April, May, or June. On redirect, Investigator Hughes agreed with the prosecutor that it was fair to say that they could not prove if the equipment malfunctioned or if the switch was flipped by both him and Detective Brickley.

[39] Based upon the record, we cannot say that the trial court abused its discretion in finding that there was clear and convincing evidence that the exception in Rule 617(a)(3) applied. Accordingly, we cannot say that the trial court abused its discretion by admitting the recorded portions of the interview of Cherry.

### B. *Documents from Internet and Cellular Providers*

[40] Cherry cites Ind. Evidence Rule 901 and argues that there was no evidence to link the photographs or text messages that supported the State's argument on the counts of intimidation, child exploitation, intimidation, stalking, and dissemination of matter harmful to minors other than the documents that used the MEID. Without citation to the record, he asserts that the trial court abused its discretion in overruling his timely objection to the authenticity of the documents. He does not cite to any specific exhibit out of the seventy-nine exhibits that were admitted at trial to support his argument that the trial court abused its discretion. *See* Ind. Appellate Rule 46(A)(8) (governing the arrangement and content of briefs and providing that "[e]ach contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on, in accordance with Rule 22" and that "[i]f the admissibility of evidence is in dispute, citation shall be made to the pages of the Transcript where the evidence was identified, offered, and received or rejected, in conformity with Rule 22(C)"). Accordingly, we conclude that Cherry waived this argument.

## II.

[41] The next issue is whether the evidence is sufficient to sustain Cherry's convictions. He does not argue that the evidence was insufficient to sustain any specific charge. Rather, He argues that there was no physical evidence to link him to any of the numerous counts and that only his statement to police tended to establish that he was the person who committed the offenses.

[42] The State points out that Cherry does not contest that the crimes were committed or that any specific element of any individual crime was lacking. The State also points to Cherry's statement to law enforcement linking him to the charged crimes, the fact that the IP address from which relevant Facebook posts were made belonged to a mobile telephone which detectives traced to Cherry's residence, Cherry's movements from Alabama to Indianapolis and back to Alabama, and the mobile telephone records.

[43] When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.* Identity may be established entirely by circumstantial evidence and the logical inferences drawn therefrom. *Bustamante v. State*, 557 N.E.2d 1313, 1317 (Ind.

1990). Identification testimony need not necessarily be unequivocal to sustain a conviction. *Heeter v. State*, 661 N.E.2d 612, 616 (Ind. Ct. App. 1996).

[44] Cherry's statement implicated him in the crimes. The police recovered evidence that a .25 caliber weapon was used at the scene at Rentham Lane and at Buffalo Ridge. When asked if he remembered what kind of gun it was, Cherry stated that it was a "deuce five," State's Exhibit 66 at 15:51:45-15:51:55, which is a "[s]treet term representing a firearm – a .25 caliber firearm in particular." Transcript at 143. The hotel receipt and document from Avis Car Rental indicated Cherry was in Indiana during the time of the shootings. The jury also heard the phone call and could compare the voice on the phone call with Cherry's voice. Based upon the evidence discussed above and reflected in the record, we conclude that the State presented evidence of probative value from which a reasonable jury could have determined beyond a reasonable doubt that Cherry was the person who committed the crimes.

## *Conclusion*

[45] For the foregoing reasons, we affirm Cherry's convictions.

[46] Affirmed.

Baker, J., and May, J., concur.