

IN THE

# Court of Appeals of Indiana

Jeffery Dean Scheel,

*Appellant-Defendant*



FILED

Jun 05 2024, 8:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

State of Indiana,

*Appellee-Plaintiff*

---

June 5, 2024

Court of Appeals Case No.
23A-CR-1379

Appeal from the Decatur Superior Court

The Honorable Matthew D. Bailey, Judge

Trial Court Cause No.
16D01-2207-CM-623

---

**Opinion by Judge Foley**
Judges May and Mathias concur.

**Foley, Judge.**

[1] Following a bench trial, Jeffery Dean Scheel ("Scheel") was convicted of Class A misdemeanor remote aerial harassment[1] based on the way he operated a drone. Scheel now appeals, claiming the State failed to present sufficient evidence supporting the conviction. Identifying sufficient evidence, we affirm.

## Facts and Procedural History[2]

[2] In 2022, the State charged Scheel with remote aerial harassment as a Class A misdemeanor.[3] The State specifically alleged that, "on or about a period between the 29th day of April . . . 2022 and the 11th day of May . . . 2022," Scheel "[d]id operate an unmanned aerial vehicle in a manner that [was] intended to subject another person to harass[]ment[.]" Appellant's App. Vol. 2 p. 15. The matter progressed to a bench trial, which was held in April 2023.

[3] The trial focused on events in the spring of 2022. At that time, Scheel lived in the Lake Santee subdivision in Decatur County, approximately 400 yards

---

[1] Ind. Code § 35-45-10-6.

[2] As part of our civic-education program known as "Appeals on Wheels," we held an oral argument in this case on May 14, 2024, at Fort Wayne's North Side High School. We thank the school's leadership and personnel for the generous hospitality and commend the student-attendees for their respectful and engaged participation. We also extend our commendations to counsel, who not only provided skilled advocacy, but also provided insightful responses to myriad student inquiries regarding the life and skillsets of a practicing Hoosier lawyer.

[3] The State also charged Scheel with Class A misdemeanor remote aerial voyeurism pursuant to Indiana Code Section 35-45-4-5(g)(1), but the trial court eventually dismissed the charge upon the State's motion.

across the lake from the Kennelly family—i.e., Kyle Kennelly ("Kyle"), Betsy Kennelly ("Betsy"), and their three daughters, aged thirteen, eleven, and nine.

[4] Kyle testified that, when he was out fishing, a drone "would hover above [him] and then follow [him] down the lake." Tr. Vol. 2 p. 15. When asked if he saw "the drone go anywhere after that," Kyle said: "Multiple nights, we saw it go back to [Scheel's] place and observed [Scheel] on his porch flying it." *Id.* at 16. Kyle said he saw Scheel "on his lakeside porch with his goggles on"—"his VR goggles"[4]—with a "remote in hand" and the "drone flying around his area." *Id.*

[5] Kyle testified that he encountered a drone "a couple [of] times" while fishing. *Id.* at 15. Kyle also testified that, before April 29, 2022, there had been an issue with a drone approaching his daughters and hovering near them. As Kyle put it: "Multiple times, the girls would come in from the trampoline with [the drone] hovering above the trampoline. Also, they would be out on their kayak[s] and [the drone] would be . . . hovering above their kayaks." *Id.* at 18–19. Kyle said the drone appeared to be the same drone he saw in the past, which was the drone "that had flown back to [Scheel's] house." *Id.* at 19. Kyle further testified that his daughters seemed "scared" by those encounters. *Id.* Betsy later testified that the drone flights "scare[d] [her] children." *Id.* at 43.

---

[4] VR is an abbreviation for virtual reality. *See VR,* Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/VR (last visited Mar. 6, 2024) [https://perma.cc/CED2-Z5D2].

Betsy noted that she, too, had been impacted because she "ha[d] to comfort them and explain to them what's going on and try to . . . calm them down." *Id.*

[6] Leading up to April 29, 2022, the Kennelly family had encountered a drone "three to five" times. *Id.* at 21. Kyle did not record any video footage of those encounters. However, Kyle recorded video footage when he encountered a drone on April 29, 2022, and again on May 10, 2022. The video footage of each encounter was admitted as State's Exhibits 15 and 16, respectively.

[7] As for April 29, Kyle testified that he "followed the sound" of a drone when he was getting home from work. *Id.* at 20. The State questioned Kyle as follows:

> Q  . . . And when you first pulled out your phone to start to capture the video, where was the drone at that point?
>
> A  Front of the house.
>
> Q  Okay. And where was it in relationship to your property and to the windows of the girls?
>
> A  I would say it was on my property, probably 20 feet from the windows or so.
>
> Q  Okay. And by the time you started to walk around to film, it had moved?
>
> A  It was . . . coming around . . . toward[] the other window, the other side . . . .

*Id.* at 20–21.

[8]  As for May 29, Kyle said the video captured an area on the lake to "the left side of [his] house," where his daughters were kayaking "out in the cove." *Id.* at 22. When asked which direction the drone was "flying away to," he said: "Right back to [Scheel's] house." *Id.* Eventually, Kyle confronted Scheel and told him "he shouldn't be flying around [the] girls' windows." *Id.* at 24. Kyle confirmed that, during the conversation, Scheel "didn't deny . . . flying the drone[.]" *Id.* at 23. Rather, when confronted, he said "he wasn't doing anything wrong." *Id.*

[9]  Detective Jean Burkert ("Detective Burkert") of the Decatur County Sheriff's Office[5] testified about an investigation of the drone flights that ultimately led to a warrant permitting a search of Scheel's home. When executing the search warrant in May 2022, law enforcement found "drone equipment," including two drones, a remote control, and "virtual reality goggles[.]" *Id.* at 7. State's Exhibits 1 through 14 are pictures documenting the search of Scheel's home and the drone equipment found there. At one point, the State asked Kyle whether the drone photographed in State's Exhibit 9 "ha[d] the same physical characteristics of the drone that [he] had been seeing coming onto [his] property[.]" *Id.* at 22. Kyle said: "Yes." *Id.* Kyle also testified that the goggles and the remote appeared to have the same characteristics as "what [he] saw on [Scheel]" in the past. *Id.* Kyle further testified that he recognized the drone as

---

[5] Detective Burkert introduced herself as a deputy sheriff, but the parties referred to her as a detective. *See, e.g.*, Tr. Vol. 2 pp. 8, 9; Appellant's Br. p. 7.

Scheel's because Scheel's drone was "the only drone that's been flying around at the lake." *Id.* at 35.

[10] In his closing argument, Scheel claimed there was insufficient evidence that he was the one who flew the drone, arguing as follows: "[B]oth of the eyewitnesses say they knew [Scheel] had a drone, they saw him fly a drone around his house, and when it flew near their house, they assumed it was his. But that's certainly not proof beyond a reasonable doubt that [the complained-of drone was] even [Scheel's] drone." *Id.* at 46. Scheel asserted that all drones had the same general appearance, arguing: "I think they all basically match. It's four little propellers in a cross shape." *Id.* Scheel also argued that there was "no evidence presented that . . . whomever was flying that drone was intending to harass anyone." *Id.* at 47. He argued that "the lake is a common area" and "we do not own the airspace above our home." *Id.* at 46. Scheel added that "[t]here's no evidence of a reason why [Scheel] would want to harass" Kyle. *Id.* at 47. Scheel also contended that the drone flights at issue were not harassing. Scheel referred to the video evidence, which he claimed contradicted Kyle's testimony that, at one point, the drone hovered twenty feet away from a child's window.

[11] The trial court found Scheel guilty as charged, noting that it found "Kyle . . . to be a credible witness" and that the State had ultimately "met its burden of proof[.]" *Id.* at 48–49. The trial court later held a sentencing hearing and imposed a sentence of 360 days in the Decatur County Jail with 8 days executed and 352 days suspended to probation. Scheel now appeals.

## Discussion and Decision

[12] Scheel challenges the sufficiency of the evidence supporting his conviction for remote aerial harassment. "When reviewing a challenge to the sufficiency of evidence supporting a conviction, we neither reweigh the evidence nor assess the credibility of witnesses." *Fix v. State*, 186 N.E.3d 1134, 1138 (Ind. 2022). Rather, we consider "only the probative evidence and the reasonable inferences" supporting the conviction. *Id.* We reverse only if "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.* (quoting *Jackson v. State*, 50 N.E.3d 767, 770 (Ind. 2016)).

[13] Here, Scheel was convicted of Class A misdemeanor remote aerial harassment. "A person who operates an unmanned aerial vehicle in a manner that is intended to subject another person to harassment commits remote aerial harassment, a Class A misdemeanor." Ind. Code § 35-45-10-6.[6] Moreover, as discussed later herein, "harassment" has the specific definition set forth in Indiana Code section 35-45-10-2.

---

[6] Scheel does not dispute that a drone is an "unmanned aerial vehicle." Our legislature defined this term in Indiana Code section 35-31.5-2-342.3, which provides as follows:

> "Unmanned aerial vehicle" means an aircraft that does not carry a human operator and that is capable of flight under remote control or autonomous programming. The term includes the following:
>
> (1) An unmanned aircraft and an unmanned aircraft system (both as defined in the Federal Aviation Administration Modernization and Reform Act of 2012 (P.L.112-95, 126 Stat. 11).
>
> (2) A small unmanned aircraft and a small unmanned aircraft system (both as defined in 14 CFR 107.3).

Scheel claims there was insufficient evidence that (1) he was the person who flew the drone, (2) he intended to harass anyone, and (3) the drone flights met the definition of harassment. We address each of Scheel's contentions in turn.

## I. Identity

In every case, the State must prove beyond a reasonable doubt that the accused was the person who committed the charged offense. *Cf., e.g., Taylor v. State*, 86 N.E.3d 157, 163 (Ind. 2017). "Identity may be established entirely by circumstantial evidence and the logical inferences drawn therefrom." *Cherry v. State*, 57 N.E.3d 867, 877 (Ind. Ct. App. 2016), *trans. denied*. For there to be sufficient evidence regarding identity, the "[i]dentification testimony need not necessarily be unequivocal[.]" *Id.* Moreover, to the extent the case involves circumstantial evidence identifying the defendant, the evidence is sufficient if a "reasonable [fact-finder] could have inferred that the defendant committed the crime[] charged." *Young v. State*, 198 N.E.3d 1172, 1182 (Ind. 2022).

In challenging the sufficiency of the State's identification evidence, Scheel generally focuses on the evidence least favorable to his conviction. For example, Scheel directs the court to Kyle's testimony acknowledging that drones "all look pretty similar." Tr. Vol. 2 p. 22. He also points out that, at one point, Kyle testified that the drone was a black drone, but black was "not the color of either of . . . Scheel's drones." Appellant's Br. p. 10. Scheel argues that, "[w]ithout positively identifying the drone, observing . . . Scheel[,] or even seeing the drone return to . . . Scheel's property" on the two occasions captured

on video, "there is simply no proof that the drones [Kyle and Betsy] saw were being operated by [Scheel]." *Id.* Scheel suggests that Kyle was motivated to accuse him because Kyle had "heard negative things about [him]." *Id.* Scheel also discusses hypothetical evidence that, if presented, would have made for a stronger case against Scheel. That is, Scheel suggests that the State should have presented "images or photographs . . . found to have been taken with [his] drones" that corresponded with the encounters Kyle described. *Id.* at 7. All in all, Scheel challenges the reasonableness of the inferences to be drawn from the evidence, and argues Kyle and Betsy made "assumptions without corroboration of any kind" that Scheel was the person who operated the drone. *Id.* at 10.

[17]     The State points out that, by focusing on the evidence least favorable to his conviction, Scheel's appellate arguments amount to "a request to reweigh the evidence, which this [c]ourt does not do." Appellee's Br. p. 8. We agree with the State. Consistent with our standard of review, we must focus on evidence supporting the conviction, which includes evidence that (1) on more than one occasion, Kyle was followed by a drone that flew back to Scheel; (2) Kyle saw Scheel operating the drone with VR goggles; (3) Scheel's drone was "the only drone that's been flying around at the lake," Tr. Vol. 2 p. 35; (4) when Kyle told Scheel "he shouldn't be flying around [the] girls' windows," Scheel responded only that "he wasn't doing anything wrong" *id.* at 23; and (5) Scheel possessed drone equipment consistent with Kyle's observations. We ultimately conclude that, based on the evidence presented, a fact-finder could reasonably infer that Scheel was the person who repeatedly flew a drone near the Kennelly family.

## II. Intent to Harass and Nature of the Drone Flights

[18] Scheel challenges the sufficiency of the evidence that he intended to harass anyone when operating a drone. As to intent, our legislature criminalized operating a drone "in a manner that is intended to subject another person to harassment[.]" I.C. § 35-45-10-6. Here, the parties agree the pertinent inquiry is whether Scheel intended to harass the Kennelly family by his operation of the drone. "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." I.C. § 35-41-2-2. In general, "[i]ntent can be inferred from a defendant's conduct and the natural and usual sequence to which such conduct logically and reasonably points." *Hightower v. State*, 866 N.E.2d 356, 368 (Ind. Ct. App. 2007) (quoting *E.H. v. State*, 764 N.E.2d 681, 683 (Ind. Ct. App. 2002), *trans. denied*), *trans. denied*. Moreover, we have previously noted that "[i]ntent is a mental function; hence, absent a confession, it often must be proven by circumstantial evidence." *Id.*

[19] In this case, the State attempted to prove intent by relying on evidence about the nature of the drone flights. Thus, whether the State presented sufficient evidence of Scheel's intent depends on whether there is sufficient evidence that the drone flights themselves satisfied the statutory definition of harassment. *Cf.* Appellant's Br. p. 10 (encouraging us to "look, objectively, at the actions taken by the remote aerial vehicle and, perhaps, the context of the relationship between the parties, to determine [whether the drone] was operated with the intent to harass"); Appellee's Br. p. 8 (focusing on Scheel's conduct, asserting: "The natural consequence to which Scheel's conduct points is that he intended

to subject the Kennelly family to harassment because his conduct was targeted, repetitive, and alarming."). We therefore turn to Scheel's contention that there was insufficient evidence that use of the drone constituted statutory harassment.

[20] Regarding Scheel's operation of the drone, the State was required to prove that Scheel's conduct directed toward the Kennelly family amounted to harassment. Our legislature adopted the following definition of harassment:

> As used in this chapter, "harassment" means conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress. Harassment does not include statutorily or constitutionally protected activity, such as lawful picketing pursuant to labor disputes or lawful employer-related activities pursuant to labor disputes.

I.C. § 35-45-10-2. On appeal, Scheel focuses on the objective and subjective elements of harassment expressed in the statute. That is, he challenges the sufficiency of evidence that the drone flights "would cause a reasonable person to suffer emotional distress" and "actually cause[d] . . . emotional distress." *Id.*

[21] Regarding subjective emotional distress, there was evidence that the drone flights "scare[d] [the] children." Tr. Vol. 2 p. 43. As a result, Betsy—who felt "uncomfortable" because of the drone flights—"ha[d] to comfort [the children] and explain to them what's going on . . . to try to calm them down." Tr. Vol. 2 p. 43. Furthermore, Scheel's conduct led Kyle to record two drone encounters and ultimately confront Scheel about the way he flew the drone, telling Scheel

"he shouldn't be flying around [the] girls' windows." *Id.* at 23. We conclude the foregoing evidence was sufficient to prove the Kennellys were emotionally distressed due to the drone flights. To the extent Scheel argues otherwise, his arguments amount to a request to reweigh the evidence, which we decline.

[22] As for objective emotional distress, Scheel claims the State failed to prove that a reasonable person would have been distressed by the drone flights. In general, Scheel focuses on the video footage, asserting that "[n]o reasonable person observing what was in those videos would be distressed." Appellant's Br. p. 12. Scheel also claims there was insufficient evidence that a reasonable person would be distressed by the drone flights because "any emotional distress felt by the Kennelly[s] was less from the fact that they saw a drone and more because they *thought* it was . . . Scheel's drone. They had heard bad things about . . . Scheel and that is what gave them concern. Not a drone, only . . . Scheel's drone." *Id.* According to Scheel: "It simply cannot be the case that seeing a drone that you think is being operated by someone you don't like is what the legislature was seeking to prevent when it made remote aerial harassment a crime." *Id.* Scheel also asserts that this court "should not find that a drone flying in public airspace constitutes impermissible conduct." *Id.*

[23] We conclude that the record discloses sufficient evidence that a reasonable person would have experienced emotional distress under the circumstances. That is, the State proved there were multiple drone flights directed toward the Kennelly family, including a flight near the Kennelly residence and other flights that hovered over the children as they kayaked in the lake and jumped on the

trampoline. Having seen a drone returning to the same person—Scheel—a reasonable person would feel targeted by these drone flights. Moreover, it is a common assumption that a drone features video capabilities and, here, Scheel was seen controlling a drone with VR goggles. Thus, in light of the repeated drone flights targeting the Kennelly family—drone flights that were focused on minors and invasive of their privacy, especially in light of the VR equipment involved—we conclude that the State presented sufficient evidence that a reasonable person would suffer emotional distress under the circumstances. Furthermore, based on the nature of the drone flights, we also conclude that the State presented sufficient evidence that Scheel had the required intent to harass.

## Conclusion

The State presented sufficient evidence that Scheel committed Class A misdemeanor remote aerial harassment.

Affirmed.

May, J., Mathias, J., concur.

ATTORNEY FOR APPELLANT

Ross G. Thomas
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Alexandria N. Sons
Deputy Attorney General
Indianapolis, Indiana