

**FILED**

Oct 20 2020, 10:40 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven E. Ripstra
Ripstra Law Office
Jasper, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Kyle Schneider,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

October 20, 2020

Court of Appeals Case No.
19A-CR-1928

Appeal from the Dubois Circuit
Court

The Honorable Nathan A.
Verkamp, Judge

Trial Court Cause No.
19C01-1901-MR-47

**Pyle, Judge.**

# Statement of the Case

Kyle Schneider ("Schneider") appeals his conviction by jury of murder[1] and his adjudication as an habitual offender.[2] He argues that the trial court abused its discretion in: (1) admitting and excluding evidence; and (2) instructing the jury. Concluding that the trial court did not abuse its discretion, we affirm the trial court's judgment.

We affirm.

# Issues

1. Whether the trial court abused its discretion in admitting and excluding evidence.

2. Whether the trial court abused its discretion in instructing the jury.

# Facts

The facts most favorable to the verdict reveal that in January 2019, twenty-seven-year-old Schneider lived with Chloie Lubbehusen ("Lubbehusen") in Lubbehusen's trailer in rural southern Indiana. Lubbehusen and Schneider had been dating for a month. Lubbehusen's cousin, Tikelan Kilburn ("Kilburn"), and Kilburn's wife, Ashley ("Ashley") lived in a house, which was across the road from Lubbehusen's trailer.

---

[1] IND. CODE § 35-42-1-1.

[2] I.C. § 35-50-2-8.

[4] At approximately 7:30 a.m. on January 11, 2019, Ashley heard someone banging on her front door and "jingling" the door handle. (Tr. Vol. 4 at 74). When she looked out the window, Ashley saw a naked Schneider walking between her house and Kilburn's car. Ashley tried to wake up Kilburn, who was still sleeping, but she was unable to do so. She texted and telephoned Lubbehusen, who did not respond. When Ashley looked out the window again, she noticed something on Lubbehusen's front porch. Ashley went outside to investigate and discovered a naked and bloody Lubbehusen lying on the porch.

[5] Ashley covered Lubbehusen with a blanket, called 911, ran back to her house, and woke up Kilburn. Ashley and Kilburn returned to Lubbehusen's porch. Lubbehusen was struggling to breathe and was unable to communicate with Ashley and Kilburn. Kilburn noticed that there was "blood everywhere." (Tr. Vol. 4 at 118). While Ashley was still on the phone with a 911 dispatcher, Kilburn picked up Lubbehusen and carried her into the trailer to get her out of the extreme cold. Kilburn placed Lubbehusen on the living room floor. While sitting with Lubbehusen, Kilburn and Ashley noticed a bloody knife in the living room. Kilburn also noticed "a blood trail through the kitchen to the bedroom." (Tr. Vol. 4 at 119).

[6] Shortly thereafter, Dubois County Sheriff's Department deputies Stuart Wilson ("Deputy Wilson") and Brad Kendall ("Deputy Kendall"), a first responder, and others arrived at the scene. The first responder transported Lubbehusen to the hospital, where Lubbehusen died shortly thereafter. The deputies remained

at the scene to search for Schneider. Deputy Wilson found Schneider hiding in insulation in a detached garage located near Lubbehusen's trailer. Schneider, who was wearing only a pair of socks and had blood on his hands, yelled, "don't shoot me. I want to tell my side of the story." (Tr. Vol. 3 at 209).

[7] Deputy Wilson accompanied Schneider, who had no difficulty walking, to a nearby sheriff's department vehicle. Deputy Wilson gave Schneider a blanket and placed him in the backseat of Deputy Kendall's vehicle. While the deputies were discussing the case, Schneider rolled down the vehicle's window and shouted: "[A]re there any vet[eran]s here? Any vet[eran]s? I want to talk to a vet[eran]. I want to talk to someone that's killed somebody." (Tr. Vol. 3 at 213). When Deputy Kendall walked over to his vehicle to roll up the window, Schneider asked the deputy if he "ha[d] [] ever killed anybody." (Tr. Vol. 3 at 240). When Deputy Kendall responded that he had not, Schneider told the deputy that "this would be [Schneider's] first." (Tr. Vol. 3 at 240).

[8] Deputy Kendall subsequently got into his vehicle to drive Schneider to the "security center and to just detain [Schneider] there for questioning." (Tr. Vol. 3 at 240). On the way to the security center, Schneider began complaining that he "hadn't used the bathroom in weeks and that his anus was bleeding." (Tr. Vol. 3 at 241). Deputy Kendall stopped at the hospital so that a doctor could examine Schneider.[3]

---

[3] Medical professionals found no evidence that Schneider's anus was bleeding.

[9] While Schneider was at the hospital, a hospital phlebotomist obtained a sample of Schneider's blood. In addition, Indiana State Police Trooper Ted Clamme ("Trooper Clamme") collected swabs from Schneider's hands and cheeks. Trooper Clamme also took photographs of Schneider's hands and collected Schneider's socks. Schneider was compliant with Trooper Clamme's requests, and the trooper noticed no signs that Schneider was intoxicated.

[10] Also while Schneider was at the hospital, Dubois County Sheriff's Department Detective Jesus Monarrez (Detective Monarrez") and Indiana State Police Detective Brock Werne ("Detective Werne") recorded an interview with Schneider ("the First Video Interview"). Before the interview, Detective Monarrez advised Schneider of his *Miranda* rights. Schneider responded that he understood his rights and waived them. During the interview, Schneider was oriented to place and time, and he answered questions coherently and in a logical sequence. Both detectives noticed that Schneider appeared to be of normal intelligence and physical condition. In addition, based on the detectives' training and experience, the detectives did not notice any signs that Schneider was intoxicated. The detectives did not use violence, threats, or promises while interviewing Schneider. At the time of the interview, the detectives did not know whether Lubbehusen was alive, and Detective Werne told Schneider that he was going to talk to Lubbehusen. Schneider appeared surprised and asked if Lubbehusen was still alive. The First Video Interview lasted less than thirty minutes.

[11] At some point during the interview, the video camera's battery died. Detective Monarrez went to the prosecutor's office to get another video camera. When he returned to the hospital, the two detectives interviewed Schneider for a second time ("the Second Video Interview"). During the interview, Schneider invoked his right to counsel and asked the detectives for "advice." (State's Ex. 1, Disk 3, 2:05-3:00). The detectives told Schneider that they could not speak to him if he wanted to consult with an attorney but that he could waive his right to counsel if he chose to do so. Schneider responded that he wanted to speak to Detective Monarrez and that he wanted Detective Werne to leave the room. After Detective Werne had complied with Schneider's request and had left the room, Detective Monarrez again told Schneider that he had the right to consult with an attorney. Schneider verbally waived his right to consult with counsel, and Detective Monarrez continued the interview. At some point, Schneider again requested to consult with an attorney, and Detective Monarrez stopped the interview. Thereafter, Schneider was transported to the county jail.

[12] The following morning, January 12, 2019, at approximately 10:00 a.m., Schneider told the jail shift supervisor that he wanted to speak to Detective Monarrez again but that he did not want the interview to be recorded. Schneider spoke clearly, was able to participate in a coherent conversation, and appeared to be conscious of what he was doing. The jail supervisor, who noticed no signs that Schneider was intoxicated, telephoned Detective Monarrez and told the detective what Schneider had requested. Detective Monarrez told the jail supervisor that he would only speak to Schneider if the

interview was recorded. When the jail supervisor told Schneider what the detective had said, Schneider said that he "wanted to think about it." (Tr. Vol. 2 at 48).

[13] At 2:00 p.m., Detective Monarrez stopped by the jail to ask Schneider if he still wanted to talk to the detective. Schneider responded that he did. Schneider was escorted to an interview room and confirmed that he had requested to speak with Detective Monarrez. Detective Monarrez read Schneider his *Miranda* rights, and Schneider nodded his head to indicate that he understood his rights and wished to waive them. Schneider also signed a written waiver of rights form. During the interview ("the Third Video Interview"), Detective Monarrez noticed that Schneider was oriented to time and place. Schneider also answered questions coherently and in a logical sequence. In addition, Schneider appeared to be of normal intelligence and physical condition. Detective Monarrez did not use violence, threats, or promises while interviewing Schneider. Although Detective Monarrez had told Schneider that the interview was not being recorded, there was a camera recording the interview.

[14] An hour into the Third Video Interview, Detective Monarrez encouraged Schneider to tell him what had happened to Lubbehusen so that her family could have closure. Schneider grabbed a nearby pen and wrote "I stabbed her" on a piece of paper ("the Confession"). (Ex. Vol. 5 at 69). When Schneider attempted to cross out with the pen what he had just written, Detective Monarrez grabbed the piece of paper. Schneider asked the detective to give him

back the piece of paper. When Detective Monarrez refused to do so, Schneider grabbed the piece of paper out of the detective's hand. Several officers entered the room to help Detective Monarrez retrieve the Confession. This incident lasted less than one minute, and the Third Video Interview lasted an hour and forty minutes.

[15] Forensic pathologist Dr. James Jacobi ("Dr. Jacobi") performed Lubbehusen's autopsy on January 11, 2019. Dr. Jacobi found that Lubbehusen had been stabbed a total of ten times. Specifically, Lubbehusen had a one-inch stab wound on her forehead that had penetrated both her skull and her brain and another stab wound on the back of her head that had also penetrated both her skull and her brain. This was the first time that Dr. Jacobi had seen stab wounds that had penetrated the victim's skull. According to Dr. Jacobi, it would have taken a "significant amount of force" for the knife to penetrate Lubbehusen's skull. (Tr. Vol. 5 at 29). Lubbehusen also had three stab wounds to the back of her neck that had penetrated her spine and "creased or compressed [her] spinal cord." (Tr. Vol. 5 at 30). In addition, Lubbehusen had incisions near her navel, on her leg, and near the center of her forehead. Dr. Jacobi concluded that the cause of Lubbehusen's death was exsanguination, which was a loss of blood from the stab wounds.

[16] In addition, laboratory tests revealed that Schneider's DNA was found on Lubbehusen's internal and external genitalia and on her anus. Schneider's DNA was also found under Lubbehusen's fingernails, on the bloody knife

found in Lubbehusen's living room, and on Lubbehusen's left hand. Lubbehusen's DNA was found on the bloody knife and on Schneider's socks.

[17] On January 16, 2019, the State charged Schneider with murder and alleged that he was an habitual offender. In April 2019, Schneider filed a motion to suppress the First, Second, and Third Video Interviews as well as the Confession. Schneider specifically argued that his statements were involuntary and were obtained in violation of both the Federal and Indiana Constitutions because: (1) they were "obtained as . . . the direct . . . result of confronting [Schneider] with certain material misrepresentations of fact known by the interrogator to be misrepresentations[;]" (2) "the consumption of drugs so affected the defendant that he was deprived of his free and independent will, such that the [First Video Interview] statement was the product of an irrational mind or coercion[;]" and (3) "[t]he interrogation continued after [Schneider] had elected to consult with an attorney prior to further questioning." (App. Vol. 3 at 19-20).

[18] The trial court held a hearing on Schneider's motion to suppress in May 2019. At the hearing, the trial court heard the evidence set forth above regarding the video interviews and the Confession. Also at the hearing, Deputy Kendall testified that Schneider began "rambling" while the deputy was driving him to the security center. (Tr. Vol. 2 at 121). When Deputy Kendall stopped his car and advised Schneider of his *Miranda* rights, Schneider told the deputy "several times that he knew his rights and that he had been in prison before and knew his rights." (Tr. Vol. 2 at 122). In addition, a forensic toxicologist testified at

the hearing that the blood that had been drawn from Schneider on the morning of Lubbehusen's murder had tested positive for methamphetamine, amphetamines, and THC. The forensic toxicologist further testified that a person with the levels of methamphetamine, amphetamines, and THC seen in Schneider's blood test results, would have been "conscious of what [he was] doing and would not [have] be[en] in a state of mania." (Tr. Vol. 2 at 102).

[19] Following the hearing, the trial court took Schneider's motion to suppress under advisement. Two days later, the trial court granted in part Schneider's motion to suppress when it ordered the suppression of the Second Video Interview. However, the trial court also denied in part Schneider's motion to suppress when it denied the suppression of the First and Third Video Interviews and the Confession.

[20] Schneider's five-day trial began on May 13, 2019. During his opening statement, Schneider argued that either Kilburn had murdered Lubbehusen or Lubbehusen had stabbed herself. The State presented the evidence set forth above through the testimony of Kilburn, Ashley, Deputy Wilson, Deputy Kendall, Trooper Clamme, the jail supervisor, Dr. Jacobi, an Indiana State Police forensic biologist, and others.

[21] Also at trial, Schneider objected when the State offered into evidence the First Video Interview during Detective Werne's testimony. Schneider's objection was "based upon all issues of suppression previously brought forward[.]" (Tr.

Vol. 5 at 144). Outside the presence of the jury, the trial court responded to Schneider's objection as follows:

> [T]here was a motion to suppress, the Court, as to this particular video, the Court denied that motion to suppress[.] I believe this particular video, the – the issue that [Schneider] had raised was that he was unable to . . . waive his Constitutional Rights because of intoxication and that there was maybe some deceit on the part of the law enforcement officer[.] And – and at this point . . . with respect to the motion to suppress, you know, I watched the whole video[.] I'm going to overrule your objection.

(Tr. Vol. 5 at 145). The trial court admitted the First Video Interview into evidence, and the State played the video for the jury.

[22] During the testimony of Detective Monarrez, Schneider objected again when the State offered into evidence the Third Video Interview. Outside the presence of the jury, Schneider argued as follows:

> Judge, we had previously filed a motion to suppress. A lengthy hearing was held, exhibits were introduced, testimony was taken. We would renew that objection based upon all of that information including . . . Schneider's . . . state of intoxication, deception used by the State of Indiana to procure an involuntary statement. And renew that he had previously asserted his right to counsel and that the video that's to be produced should be suppressed based on Indiana and . . . Federal Constitutions, Judge.

(Tr. Vol. 5 at 205-06).

[23] The trial court responded to Schneider's argument as follows:

> Of course at this time I'm going to overrule your objection. I found that based on my review . . . intoxication [was] not an issue . . . in any of these interviews. As . . . you're well aware of the second interview at the hospital[,] the court did suppress and – but at that interview [Schneider] was repeatedly told that he ha[d] a right to counsel and c[ould] cease that interview at any time. At the end of that interview he did in fact make that statement and the interview ceased. Then following on the 12th[,] [Schneider][] let it be known to [the jail shift supervisor] that he wished to speak to [Detective] Monarrez. [Four] hours later approximately [Detective] Monarrez came to the Security Center. [Schneider] was brought into the interview room. [Detective] Monarrez specifically asked, I was told you want to talk to me. [Schneider] nods his head in the affirmative that he does in fact want to talk to [Detective] Monarrez. [Schneider] was then Mirandized and therefore your objection is overruled.

(Tr. Vol. 5 at 206). The trial court admitted the Third Video Interview into evidence, and the State played the video for the jury.

[24] Also during Detective Morarrez's testimony, Schneider objected when the State offered into evidence the Confession. Schneider specifically argued that he had "move[d] to suppress the evidence [and] object[ed] to its admission, as [he] did, of the prior items, pursuant to all the testimony [he] put forth before." (Tr. Vol. 5 at 211).

[25] The trial court responded to Schneider's objection as follows:

> I'm going to overrule that objection, and, you know I think I said it on the record before, this is a subsequent interview at [Schneider's] request. That he was [M]irandized. He understood his rights. You know, I found [] [Schneider] to be an intelligent man. First thing he does -- you know, I know -- I did probably

address it before, but with the respect to the trickery that he alleges that Detective Monarrez told him that there was no - he was not being recorded at some point, [I] found that to be de minimums. [Schneider] clearly with his history is - h[e's] accustom[ed] to police. The first thing he does - I didn't catch it the first time, first thing he does when he walks in the room is, he turns around, and looks at the camera up in the corner. He knew the camera was there. And, then he spends time during the interview looking through the - trying to look through the one[-]way glass. So, I certainly find that [Schneider] knew exactly what he was doing. So, with that, I going to overrule your objection.

(Tr. Vol. 5 at 211-12). Thereafter, the trial court admitted the Confession into evidence.

[26] During Schneider's case-in-chief, Schneider called Indiana State Police Crime Scene Investigator Mark Green ("Investigator Green") to the stand. Investigator Green testified that while examining the crime scene, Investigator Green had collected the following handwritten note ("the Note"), which was dated December 26, 2018, fifteen days before Lubbehusen's murder:

> To One Of The Only F**ks I have left to give, Together we are going to achieve f**king greatness, swear. Always know who's got your back. Always know your worth. I'll give you a hint, you can't put a price on it, I[']m blessed to have you. My best friend (already), my rock [and] so much more. All the love I have to offer, CHLOIE

(Ex. Vol. 5 at 69). Schneider asked the trial court to admit the Note into evidence. Based on the content of the Note, with Lubbehusen's name at the end of it, it appeared that Schneider was arguing that Lubbehusen had written it to him. The State objected and argued that Schneider had "failed to lay a

sufficient foundation for the admission. There's no proof who wrote that, doesn't have any handwriting evidence, there's no proof." (Tr. Vol. 6 at 5). The State also argued that the Note was inadmissible hearsay. The trial court sustained the objection and excluded the Note from evidence. There was no additional testimony about the Note.

[27] After the parties had presented their evidence, Schneider tendered a reckless homicide instruction and asked the trial court to instruct the jury on this lesser included offense of murder. The trial court concluded that there was no serious evidentiary dispute permitting the jury to find that Schneider had recklessly but not knowingly killed Lubbehusen and declined to give the instruction.

[28] The jury convicted Schneider of murder, and Schneider admitted that he was an habitual offender. The trial court sentenced Schneider to sixty-five (65) years for murder. In addition, the trial court enhanced Schneider's sixty-five (65) year sentence by twenty (20) years for the habitual offender adjudication. Schneider now appeals his conviction and his habitual offender adjudication.

## Decision

[29] Schneider argues that the trial court abused its discretion in: (1) admitting and excluding evidence; and (2) instructing the jury. We address each of his contentions in turn.

## 1. Admission and Exclusion of Evidence

[30]   Schneider argues that the trial court abused its discretion when it: (1) admitted into evidence the First and Third Video Interviews and the Confession;[4] and (2) excluded from evidence the Note. We review the trial court's ruling on the admission and exclusion of evidence for an abuse of discretion. *Cherry v. State*, 57 N.E.3d 867, 875 (Ind. Ct. App. 2016), *trans. denied*. We reverse only where the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Id*.

### A. Admission of Evidence

[31]   Schneider first argues that the trial court abused its discretion when it admitted into evidence the First and Third Video Interviews. He also challenges the admission of the Confession. He specifically argues that his statements in both interviews and the handwritten confession were involuntary under the federal and state constitutions.

[32]   The Fifth Amendment's privilege against self-incrimination applies to the states through the Fourteenth Amendment. *Withrow v. Williams*, 507 U.S. 680, 689 (1993). When a defendant challenges the voluntariness of a statement under the United States Constitution, the State must prove by a preponderance of the

---

[4] Although Schneider initially challenged the admission of this evidence through a motion to suppress, he now appeals following a completed trial. The issue is therefore appropriately framed as whether the trial court abused its discretion by admitting the evidence at trial. *Packer v. State*, 800 N.E.2d 574, 578 (Ind. Ct. App. 2003), *trans. denied*.

evidence that the statement was voluntarily given. *Pruitt v. State*, 834 N.E.2d 90, 114 (Ind. 2005). In addition, Article I, Section 14 of our Indiana Constitution provides that "[n]o person, in any criminal prosecution, shall be compelled to testify against himself." The Indiana Constitution requires the State to prove beyond a reasonable doubt that the defendant voluntarily waived his rights and that he voluntarily gave his statement. *Pruitt*, 834 N.E.2d at 114-15.

[33] When reviewing a challenge to the trial court's decision to admit the defendant's statements or confession, we do not reweigh the evidence. *Moore v. State*, 143 N.E.3d 334, 340 (Ind. Ct. App. 2020). Rather, we examine the record for substantial probative evidence of voluntariness. *Id*. We examine the evidence most favorable to the State, together with the reasonable inferences that can be drawn therefrom. *Malloch v. State*, 980 N.E.2d 887, 901 (Ind. Ct. App. 2012), *trans. denied*. If there is substantial evidence to support the trial court's conclusion, we will not set it aside. *Id*.

[34] The voluntariness of a defendant's statement is determined by examining the totality of the circumstances. *Luckhart v. State*, 736 N.E.2d 227, 229 (Ind. 2000). Factors to be considered are "'any element of police coercion; the length, location, and continuity of the interrogation; and the maturity, education, physical condition, and mental health of the defendant.'" *Weisheit v. State*, 26 N.E.3d 3, 18 (Ind. 2015) (quoting *Wilkes v. State*, 917 N.E.2d 675, 680 (Ind. 2009)). "The critical inquiry is whether the defendant's statements were

induced by violence, threats, promises or other improper influence." *Ringo v. State*, 736 N.E.2d 1209, 1212-13 (Ind. 2000).

[35] We turn first to the First Video Interview, which was conducted by both Detective Monarrez and Detective Werne. Our review of the evidence reveals that during the interview, which took place in a hospital room, twenty-seven-year-old Schneider was oriented to time and place, and he answered the detectives' questions coherently. Both detectives noticed that Schneider appeared to be of normal intelligence and physical condition. The First Video Interview lasted less than thirty minutes, and the detectives did not use violence, threats, or promises while interviewing Schneider. Based on our analysis of the relevant factors, we conclude that the State proved both by a preponderance of the evidence and beyond a reasonable doubt that the statement Schneider gave in the First Video Interview was voluntarily given.

[36] We further note that to the extent that Schneider argues that his statement was involuntary because he was under the influence of methamphetamine, amphetamines, and marijuana during the interrogation, a statement may be given voluntarily notwithstanding voluntary intoxication. *Luckhart*, 736 N.E.2d at 231. We will deem a defendant's statement incompetent only when he is so intoxicated that it renders him not conscious of what he is doing or produces a state of mania. *Id.* Intoxication to a lesser degree only goes to the weight to be given to the statement, not its admissibility. *Id*.

[37] Here, our review of the evidence reveals that both Detective Monarrez and Detective Werne testified that, based on their training and experience, they did not notice any signs that Schneider was intoxicated during the First Video Interview. In addition, a forensic toxicologist testified at the suppression hearing that a person with the levels of methamphetamine, amphetamines, and THC seen in Schneider's blood test results would have been "conscious of what [he was] doing and would not [have] be[en] in a state of mania." (Tr. Vol. 2 at 102). Schneider's alleged intoxication did not render his statement involuntary, and the trial court did not abuse its discretion in admitting the First Video Interview into evidence.

[38] We now turn to the Third Video Interview, which was conducted by Detective Monarrez at the jail. Schneider argues that the statement he gave in this interview was not voluntary because it was induced by Detective Monarrez's deception. Schneider specifically points out that although the detective had told him that the detective was not recording the Third Video Interview, there was a camera recording the interview. Detective Monarrez admitted at trial that he was not truthful with Schneider about recording the interview. However, such a fact, while relevant, is only one factor to be considered. *See Carter v. State*, 490 N.E.2d 288, 291 (Ind. 1986) (explaining that an officer untruthfully telling the defendant that the victim might still be alive was only one factor to consider in determining the voluntariness of the defendant's confession). The totality of the circumstance regarding a defendant's statement must be examined in order to determine the question of voluntariness. *Id*.

[39] Our review of the totality of the circumstances regarding the interview reveals that, during the interview, twenty-seven-year-old Schneider was oriented to time and place, and he answered the detective's questions coherently. Detective Monarrez noticed that Schneider appeared to be of normal intelligence and physical condition. The Third Video Interview lasted an hour and forty minutes, and Detective Monarrez did not use violence, threats, or promises while interviewing Schneider. We further note that the trial court found that, based upon his criminal history, Schneider was "accustom[ed] to police[.]" (Tr. Vol. 5 at 211). The trial court further pointed out that the first thing that Schneider did when he walked into the interrogation room was turn around and look up at the camera in the corner. Based upon Schneider's actions, the trial court concluded that Schneider "knew the camera was there[] [and] knew exactly what he was doing." (Tr. Vol. 5 at 211). Based on our analysis of the relevant factors, we conclude that the State proved both by a preponderance of the evidence and beyond a reasonable doubt that the statement Schneider gave in the Third Video Interview was voluntarily given.

[40] Schneider also argues that the statement he gave during the Third Video Interview was not voluntary because he had asked for an attorney in the Second Video Interview. He is correct that when an individual who is in custody invokes his right to counsel, all interrogation must cease until an attorney is present, and the individual must be given the opportunity to speak with the attorney and have the attorney present at any further questioning. *See Hartman v. State*, 988 N.E.2d 785, 788 (Ind. 2013). However, if the individual initiates

"'further communication, exchanges, or conversations' with law enforcement, then the individual may be further interrogated without counsel present." *Id.* (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)). Here, the morning after the Second Video Interview when Schneider had asked for an attorney, Schneider told the jail shift supervisor that he wanted to speak to Detective Monarrez again. The detective stopped by the jail four hours later and asked Schneider if he still wanted to talk. Schneider responded that he did. Schneider was escorted to an interview room and confirmed that he had requested to speak with Detective Monarrez. Because Schneider initiated the Third Video Interview with Detective Monarrez, his statement was voluntary, and the trial court did not abuse its discretion in admitting it.

[41] Lastly, we turn to the Confession, which Schneider handwrote during the Third Video Interview. We have already determined that the statement that Schneider gave during the Third Video Interview was voluntary; however, we will address Schneider's specific challenge to the voluntariness of the Confession. Schneider contends that the law enforcement officers "exceeded the use of reasonable force to retrieve [the Confession]." (Schneider's Br. 30).

[42] However, the critical inquiry in determining whether the Confession was voluntary is whether the confession was *induced* by violence, threats, or other improper influences. Here, Schneider does not argue that Monarrez used violence, threats, or other improper influences while interviewing Schneider, thereby inducing Schnier to handwrite the Confession. Rather, Schneider challenges the officers' retrieval of the Confession, which he had already

voluntarily written. The officers' retrieval of the Confession is not a factor that we consider when determining the voluntariness of an already-written confession.

[43] We further note that our review of the evidence reveals that an hour into the Third Video Interview, Detective Monarrez encouraged Schneider to tell him what had happened to Lubbehusen so that her family could have closure. Schneider grabbed a nearby pen and wrote "I stabbed her" on a piece of paper. (Ex. Vol. 5 at 69). When Schneider attempted to cross out with the pen what he had just written, Detective Monarrez grabbed the piece of paper. Schneider asked the detective to give him back the piece of paper. When Detective Monarrez refused to do so, Schneider grabbed the piece of paper out of the detective's hand. Several officers entered the room to help Detective Monarrez retrieve the Confession. This incident lasted less than one minute. Schneider has failed to specify how the officers' retrieval of the Confession constituted unreasonable force, and our review of the Third Video Interview reveals no such force. The trial court did not abuse its discretion when it admitted the Confession into evidence.

### B. Exclusion of the Note

[44] Schneider also argues that the trial court abused its discretion when it excluded the Note from evidence. According to Schneider, "[a]n assertion of love and support, in the Victim's handwriting, executed within two weeks of her death, would have been powerful evidence for the Defense." (Schneider's Br. 43-44).

The State responds that "the trial court did not abuse its discretion by excluding [the Note] from evidence because [the Note] lacked a proper foundation[.]" (State's Br. 34). We agree with the State.

[45] "'To lay a foundation for the admission of evidence, the proponent of the evidence must show that the evidence has been authenticated.'" *Pavlovich v. State*, 6 N.E.3d 969, 976 (Ind. Ct. App. 2014) (quoting *Hape v. State*, 903 N.E.2d 977, 989 (Ind. Ct. App. 2009), *trans. denied*), *trans. denied*. Pursuant to Indiana Evidence Rule 901(a), "[t]o satisfy the requirement of authenticating . . . an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Absolute proof of authenticity is not required. *Fry v. State*, 885 N.E.2d 742, 748 (Ind. Ct. App. 2008), *trans. denied*. All that is required is evidence establishing "a reasonable probability that an item is what it is claimed to be[.]" *Thomas v. State*, 734 N.E.2d 572, 573 (Ind. 2000). Additionally, authentication of an exhibit can be established by either direct or circumstantial evidence. *Newman v. State*, 675 N.E.2d 1109, 1111 (Ind. Ct. App. 1996).

[46] Indiana Evidence Rule 901(b) provides examples of evidence that satisfy the authentication requirement, including: (1) "[t]estimony that an item is what it is claimed to be, by a witness with knowledge[;]" (2) "[a] nonexpert's opinion that handwriting is genuine, based on a familiarity with it that was not acquired for the current litigation[;]" (3) "[a] comparison with an authenticated specimen by an expert witness or the trier of fact[;]" and (4) "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item,

taken together with all the circumstances." Ind. Evidence Rule 901(b)(1), (b)(2), (b)(3), and (b)(4).

[47] Here, during Schneider's case-in-chief, Schneider called Investigator Green to the stand. The investigator testified that while examining the crime scene, the investigator had collected the Note, which was dated December 26, 2018. Based on the content of the Note, with Lubbehusen's name at the end of it, it appeared that Schneider was arguing that Lubbehusen had written the Note to him. When Schneider asked the trial court to admit the Note into evidence, the State objected and argued that Schneider had failed to authenticate the Note. The State specifically pointed out that there was no proof as to who had written the Note and there was no handwriting evidence. The State also argued that the Note was inadmissible hearsay. The trial court sustained the objection and excluded the Note from evidence. There was no other testimony about the Note.

[48] We agree with the State that Schneider failed to authenticate the Note. Importantly, there was no testimony from a witness with knowledge that the Note was what it was claimed to be. In addition, there was no nonexpert's opinion testimony that the handwriting was genuine, and no expert's comparison of the Note with an authenticated specimen of Lubbehusen's handwriting. Lastly, there was no testimony about the appearance, contents, substance, internal patterns, or other distinctive characteristics of the Note that could be taken together with other circumstances. We further point out that the Note is not addressed to Schneider, and his name does not appear on the Note.

Because Schneider failed to authenticate the Note, the trial court did not abuse its discretion when it excluded the Note from evidence.[5]

[49] We further note that even if the trial court abused its discretion in admitting into evidence the First and Third Video Interviews and the Confession and excluding from evidence the Note, any error was harmless. The erroneous admission of evidence is harmless where "'the conviction is supported by substantial independent evidence of guilt so as to satisfy the reviewing court that there is no substantial likelihood the questioned evidence contributed to the conviction.'" *Messel v. State*, 80 N.E.3d 230, 232 (Ind. Ct. App. 2017) (quoting *Duncan v. State*, 23 N.E.3d 805, 811 (Ind. Ct. App. 2014)), *trans. denied*.

[50] Here, our review of the evidence reveals that after finding a naked and bloody Lubbehusen in her trailer, Dubois County Sheriff's Department deputies found a naked Schneider hiding in insulation in a nearby garage. Schneider asked the officers to let him tell his side of the story. While sitting in the back of Deputy Kendall's police car, Schneider yelled that he wanted to speak with someone who had killed a person. When Deputy Kendall approached his vehicle to roll up the window, Schneider asked the deputy if he had ever killed a person. When Deputy Kendall responded that he had not, Schneider told the deputy that this was his first kill. Laboratory tests revealed that Schneider's DNA was found on Lubbehusen's internal and external genitalia and on her anus.

---

[5] Because we affirm the trial court's exclusion of the Note from evidence based upon Schneider's failure to authenticate it, we need not determine whether the Note was hearsay.

Schneider's DNA was also found under Lubbehusen's fingernails, on the bloody knife found in Lubbehusen's living room, and on Lubbehusen's left hand. In addition, Lubbehusen's DNA was found on Schneider's socks. The evidence further revealed that Lubbehusen had been so violently stabbed that the knife had penetrated both her skull and brain both in the front and the back of her head and compressed her spinal cord. Given this overwhelming independent evidence of Schneider's guilt, we find that there is no substantial likelihood that the First and Third Interviews and the Confession contributed to Schneider's conviction. Any error in the admission of this evidence was therefore harmless.

## 2. Jury Instructions

Schneider also argues that the trial court abused its discretion when it instructed the jury. Schneider specifically contends that the trial court abused its discretion when it declined to give his tendered lesser-included offense instruction for reckless homicide.

In *Wright v. State*, 658 N.E.2d 563, 566 (Ind. 1995), the Indiana Supreme Court set forth a three-part test that trial courts should perform when called upon by a party to instruct the jury on a lesser-included offense to the crime charged. First, the trial court must compare the statute defining the crime charged with the statute defining the alleged lesser-included offense to determine if the alleged lesser-included offense is inherently included in the crime charged. *Id*. Second, if the trial court determines that an alleged lesser-included offense is

not inherently included in the crime charged under step one, then it must determine if the alleged lesser-included offense is factually included in the crime charged. *Id.* at 567. If the alleged lesser-included offense is neither inherently nor factually included in the crime charged, the trial court should not give an instruction on the alleged lesser-included offense. *Id.* Third, if a trial court has determined an alleged lesser-included offense is either inherently or factually included in the crime charged, "it must look at the evidence presented in the case by both parties" to determine if there is a serious evidentiary dispute about the element or elements distinguishing the greater from the lesser offense and if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater. *Id.* It is reversible error for a trial court not to give a requested instruction on inherently or factually included lesser offenses if there is such an evidentiary dispute. *Id.* We now apply this framework to Schneider's tendered lesser-included reckless homicide instruction.

[53] Reckless homicide is an inherently included lesser offense of murder. *Id.* The only element distinguishing the two offenses is the defendant's state of mind. *Id.* Reckless homicide occurs when the defendant "recklessly" kills another human being. IND. CODE § 35-42-1-5. Reckless conduct is action taken in plain, conscious, and unjustifiable disregard of harm that might result. IND. CODE § 35-41-2-2(c). In addition, the disregard involves a substantial deviation from acceptable standards of conduct. *Id.*

[54] Murder, on the other hand, occurs when the killing is done "knowingly" or "intentionally." IND. CODE § 35-42-1-1. A person engages in conduct

"knowingly" if the person is aware of a high probability that he is doing so. IND. CODE § 35-41-2-2(b). Accordingly, Schneider was entitled to an instruction on reckless homicide if there was a serious evidentiary dispute permitting the jury to find that he recklessly but not knowingly killed Lubbehusen. *See McEwen v. State,* 695 N.E.2d 79, 85 (Ind. 1998).

Here, our review of the evidence reveals that Schneider stabbed Lubbehusen ten times. Schneider used enough force while stabbing Lubbehusen's head to twice penetrate both her skull and her brain. Schneider also stabbed Lubbehusen in the back of the neck with enough force to penetrate Lubbehusen's spine and compress her spinal cord. Stabbing a victim multiple times in the head and chest is evidence of an awareness of a high probability that the victim will be killed. *See id*. (explaining that "an assault . . . with a knife or similar sharp object – particularly in the chest or head region – rarely occurs without awareness of a high probability that death will result"). Based on this evidence, there was no serious evidentiary dispute permitting the jury to find that Schneider recklessly but not knowingly killed Lubbehusen. *See id*. Accordingly, the trial court did not abuse its discretion when it refused to give the jury Schneider's tendered instruction on the lesser-included offense of reckless homicide.

Affirmed.

Bradford, C.J., and Weissmann, J., concur.